Mr. Haines for plaintiff below.
The case agreed upon by the parties, shows that the damage was sustained by reason of the team of the plaintiff running off the abutment of a public bridge, which was without side railings or parapets.
*109 The only question raised in the courts below, was, whether the Board of Chosen Freeholders of a County are obliged by law, to make and repair the abutments of such bridge.
At the close of the first argument in this court, the further question was raised, whether the Board of Chosen Freeholders of a County are liable in a civil suit for any private injury sustained by neglect of such duty.
First, as to the duty of the Freeholders.
That they are bound by common law and by statute, to build and repair the bridge in question, is not denied.
We maintain, that a bridge “ is a building raised over water for the convenience of passage.”
That the abutment is one of the essential parts of a bridge. Am. Ency. by Low, Title, Bridge.
Without the abutment, there can be no convenience of passage.
By common law, the inhabitants of a county are bound to repair to the extent of three hundred feet of the highway at each end of the bridge. 4 Starkie’s Ev. 314; Rex v. W. Riding of Yorkshire, 7 East R. 588; 5 Taunt. R. 284; 4 Petersdorf, 700; 2 Term. R. 667; Com. Dig. 31 — 2, (Day’s Ed.) Title Chimin, B 2, note n; 3 Smith, 467; 2 Dow, 1.
The abutment being a part of the bridge, the person or body charged with the repair of one part, is equally charged with that of the other.
Second, As to the liability.
We contend, that for the neglect of this duty, the Freeholders may be proceeded against by presentment or indictment, for the public injury; and also by action, by an individual, for any extraordinary damage sustained by reason of such neglect. 3 Black. C. 219-20; Co. Lit. 56; 5 Rep. 73; Woolrych on Ways, 53.
But this particular damage must be direct and positive, and not consequential; as being delayed on a journey &c. Bul. N. P. 26.
This will not be denied as to an injury committed or duty omitted by an individual; but it will be contended, that no civil action lies against a county, for such particular damage.
If no action of this kind has been maintained in England, it is for the reason that the men dwelling in a shire or county, are not *110 in a capacity to be sued. They are neither joint trespassers, nor a body corporate.
A county in England, is a civil division of the realm, but not corporate; as such it can neither sue nor be sued; neither is there at common law, any person upon whom a fine imposed after presentment and conviction, can be levied. By statute 13 Geo. 3d, c. 78, it may be levied on individuals who, after paying it, may complain to the justices at their sessions, and procure an assessment sufficient to reimburse the money paid. 2 Chit. Cr. Law, 575.
The Statute of New Jersey, 13th Feb. 1798, Elm. Dig. 66, constitutes the Board of Chosen Freeholders of the respective counties, bodies politic and corporate; and authorizes them to purchase and hold real and personal estate; to sue and be sued ; to make and use a common seal, &c.
These boards represent their respective counties ; and the duties imposed upon the counties are to be discharged by and through them.
If then, the counties or the freeholders representing them, are charged with a duty, and are in a capacity to be sued, are they not responsible eiviliter, for damage sustained by an individual, by reason of the neglect of that duty ? The plain principles of common justice require it.
If not, then we have the anomaly of an injury sustained by reason of the neglect of a duty charged upon a body capable of being sued, and yet, no redress given for that injury.
J. S. Green, contra, contended that the only action which can be maintained against Chosen Freeholders is upon their contracts. 2 D. and E. 657, Russell et al. v. The men dwelling in the county of Devon; 3 Chitty’s Crim. Law, 1-32; Rev. L. 317 in Elm. Dig. 66; ib. 289, sec. 5; 1 Green, 314.
J. W. Miller in reply, cited Rev. L. 385; 2 D. and E. 673.
Daytoít, J.
This matter came up from the court for the trial of small causes, by Certiorari to the Circuit Court of Sussex county; where a case was made and certified to this court, pursuant to the sixth section of the act entitled “ An act to facili *111 tate the administration of justice. Har. P. L. 188. By this certified case, it appears that Strader the plaintiff’ before the justice, was driving carefully over a bridge in that county, the abutments of which, being defective, one of his horses fell off and was killed. The only question made below was whether the Board of Freeholders were responsible, or the Overseers of the Highway. The justice below gave judgment for the defendants; but the Common Pleas, upon appeal, reversed that judgment, and gave judgment for the plaintiff for seventy dollars.
Upon the first argument had in this court, the same question substantially was presented as in the court below. But the counsel on behalf of the freeholders, when about closing his argument, suggested a doubt whether an action could be maintained at all against the board, in such a case. At the moment, it was supposed there was nothing in the objection, and it was not therefore urged. His Honor the Chief Justice having afterwards turned his attention to this point, satisfied himself that it was well taken; but the counsel of Strader desiring to be heard thereon, they were permitted to argue, and did argue this question at the last term of the Court.
Two questions are therefore nowr before us,
I. Upon whom rests the duty of attending to the repairs of that part of the bridge or way, off which the horse in question fell.
II. If that duty be on the Board of Chosen Freeholders, can they be hold answerable for damages, in a civil suit.
The last point being decided in the negative, might supersede the necessity of a direct opinion upon the first. But the point being fairly before us, and understanding that cases of a like character are awaiting our decision; it is thought right and proper that an opinion be expressed on both points involved in this controversy.
I. The Board of Chosen Freeholders is a corporation created by statute, and made the agent of the county, for executing all the legal purposes, objects, business and affairs of said county. liev. L. 318. The repair of bridges (reparatio pontium, anciently a part of the trinoda necessitas,) is one of the most important of those objects, not only at common law, but as recognized by our statutes. 1 Black, C. 376; 2 Wm. Black, 685; *112 2 East, 342, 356; 2 Maul, and 8. 513; Ryan. & M. 144; 1 Barn, and A. 289; 13 Rep. 33; N. J. Rev. L. 285. It has ever been held i-n England, that the statute of 22 Henry 8th ch. 5, which places the burthen of repairing bridges, (except in special cases,) upon the county, was merely declaratory of the common law. 13 Co. 37, see. 7; 2 Inst. 701.
The burthen of repairing that part of the bridge, technically called the abutment, was unquestionably upon the board of freeholders who acted upon the part of the county, (if upon anybody,) and not upon the overseers of the highways, who acted upon the part of the township. The abutment is as much a part of the bridge, as the pier, the arches or the timbers. It consists of that mass of stone or solid work at the end of the bridge, by which the extreme arches or timbers are sustained. But the word “ abutment,” is sometimes used to designate that which unites one end of a thing to another, see Webster’s Diet, and in that sense, it must have been used in the state of the case; for it was admitted upon the argument, that the horse fell from that part of the way which connects the abutment (proper) of the bridge, with the land ; ordinarily called, the filling up. This, the freeholders contend, was no part of the bridge, but a part of the road or causeway, and as such, should have been repaired by the overseers of the highway : and it is further certified that it has been customary in the county of Sussex, for the overseer of the highways to fill in at the ends of the bridges, the earth and stone which may be necessary to enable the traveller to reach the bridge from the common highway. This custom does not however appear to have been so general or long continued, as to be of much weight as an exposition of what the law is, and it is entitled to little consideration in any other respect.
The term, a bridge, conveys to my mind the idea of a passage way, by which travellers and others, are enabled to pass safely over streams or other obstructions. A structure of stone or wood which spans the width of a stream, but is wholly inaccessible at either end, (whatever it may be in architecture,) does not meet my ideas of what is meant in law and common parlance, by a bridge.
Sound policy, moreover, requires that we so consider the law, as to compel those persons who erect the structure itself, to make *113 it accessible at its ends. It is then, that an available passage way will be obtained for the public, when the body of the bridge itself, is completed. A division of the labor between the board of freeholders and the overseers of the highways, tends very much to delay that result. The two bodies act independent of each other, and as a consequence, the latter take their own time to finish what the former began. It is for this reason that we too often see scattered throughout the country, these unfinished specimens of bridge building, standing for weeks and months, stretching their gaunt proportions from water’s edge to water’s edge, utterly inaccessible to the traveller, who is compelled to cross on some rickety, dilapidated thing, .condemned as unsafe, when a substitute was ordered, to the imminent danger of life and limb. I repeat, that sound policy requires that this state of things should cease. The roads of our country have been in the mouths of foreigners, a subject of constant reproach, and perhaps the reproach has not been wholly unmerited ; for where the action of the people (not the government) is so direct in its application to matters of this kind, as with us, nothing marks more surely their gradations in civilization and improvement, than the character of the highways. If the custom above alluded to, of dividing the labor of bridge making, between distinct bodies who work in different ways and at different times, be general, it is a bad custom and'ought to be abolished.
But independent of all arguments drawn from public policy, such a construction as will compel those who make the bridge itself, to fill it up at its ends so far as is necessary to make it a convenient and safe passage way for the public, will, in my opinion, best conform to the course of legislation in this state, as well as io ancient principles of the common law.
There is nothing in our legislation from the earliest period to the present, which shows any design to alter or meddle with the principles of the common law. I have looked into the general course of legislation commencing under our colonial government, and corning down to the present. As early as 1683, Learning and 8. 459, provision is made for the appointment of overseers of the highways to amend all such roads as were laid out by commissioners &c. and from that time forward, the books literally teem with enactments about roads and bridges. Those which apply *114 to bridges, are many of a special character, to meet the single case. These sometimes, though not always, require that the bridge and causeway leading to the fast land, be made &c. But more usually the language of the enactment is general, conforming much to those now in existence. The first general act which I find on the subject of bridges alone, was passed in 1718, and is to be found in 1 Nevill, 84, ch. 24. This act, moreover, puts the general superintendence of bridges, upon chosen freeholders; and it speaks in general language, of making and repairing bridges. Nothing in my judgment is any where to be found either extending or limiting the common law principle, whatever that principle may be.
But again, the legislation of this state, affords many instances, where companies and individuals are either bound or authorized to construct bridges, and in all such cases, the word, bridge, is used as tantamount to a complete passage way. It has never been doubted, that when companies have been required to construct bridges over canals and rail roads, that they were bound to fill up at the ends so as to make complete and safe passage ways for the public, or the owners of adjoining lands. So too, our statutes have authorized owners of land, to construct bridges on private or bye roads, over drains and ditches, Har. C. 413, and under this phraseology, it has never been doubted that the owner is bound to fill up at the ends of these bridges, so far as to make them safe and convenient passage ways for such persons as may be entitled to the use of such private way. So too, where the legislature has authorized the construction of toll bridges, (e. g. the Trenton bridge or that opposite Easton, over the Delaware,) and enacted penalties if the same be not kept in repair, the language used is merely “a good and complete bridge,” is to be erected; and yet it can never be doubted, and it never has been doubted, that they are bound not only to build and keep in repair, the body of the bridge, but the filling up at the ends so as to make them accessible and safe passage ways. In all such cases, where the word, bridge, has been used in our statutes, such has been its undoubted meaning.
But again, I have said that there is nothing in the course of our legislation, which changes the common law principle. It is important therefore that we know what that principle is.
*115 In Woolrych on Ways, 789, 4 Law L. 61, 62, it is said that the statute 22 Henry 8th, ch. 5, (which declares that those persons who are bound to make or repair bridges &c. shall make and repair the highways at the ends thereof, to the distance of three hundred feet) was merely declaratory of the common law, for in an old case, it was said that the Abbot of Combe ought to repair the bridge and the highway applying to the one end and to the other j although the soil might be in another; in order that the easement might be preserved for the people.” And it was held by the King’s Bench and subsequently by the House of Lords, in Error, that the true common law principle, was as above stated j to wit: that the county or shire which is bound to build the bridge, is likewise bound to make it accessible at its ends. And this held good even though the filling up of one of its ends, reached into another county. 3 Harr. D. 2173, and cases there cited.
Lord Ellenborough in Rex v. West Riding of Yorkshire Inhabitants, 7 East, 596, says that the object of the statute of 22 Henry 8, before referred to, was intended merely “ to define the limit which was perhaps uncertain at common law,” and therefore fixed upon three hundred feet as a proper extent of highway, to be repaired at the ends of bridges. 2 Row. 1 S. 0. in Error, In 5 Taunt. 299, Lord Eldon likewise considered this statute as merely defining the extent of the common law liability; and that a liability to repair at the ends of bridges, was independent of and prior to the .statute in question. The statute of 22 Henry 8, has never been re-enacted in this state, and the common law principle remains therefore in full force. If any custom to the contrary have crept in, it must be of modern origin — is subversive of ancient principles, and contrary to sound policy.
II. But there is another important point which remains to be considered. Can the Board of Chosen Freeholders be held responsible in such a case, for damages, in a civil suit ? I am satisfied that the view taken of this question by the Chief Justice, is correct: that no such action can be sustained. I have the more confidence in this conclusion, because I have reached it against my first impressions.
Although no such officer by name as a Chosen Freeholder, is known to the common law, or to the English statutes, yet there *116 have ever existed persons charged with the immediate duty of attending to highways and bridges. The English statutes like ours, have surveyors and overseers for mending the highways, 13 Geo. 3, oh. 78; and surveyors and treasurers &c. whose duty it is specially to attend to the repairs of bridges, on behalf of the counties, 1 Anne, 1, ch. 18; and 13 Geo. 3, ch. 7, 8; and although these persons are natural persons, and capable of suing and being sued, yet not a single ease can be found where either or any of them have been held liable, at common law, for damages in a civil suit by reason of a neglect of their public duties. The only remedy in such cases has been by indictment or presentment. And even this remedy, at common law, is not against the public officer, but against the parish or county which is bound for the repairs of the highway or bridge, 2 Black, R. 685; Cro. Car. 365; Rex v. Dixon et al. 12 Mod. 198; Rex v. Great Broughton, 5 Burr. 2700; 1 Lord Raymond, 715; 4 Burr. 2510; 5 Durnf. and E. 499. It should be remembered, that at common law, counties were not bound to make public bridges, but merely to repair them, Roscoe’s Ev. 246; Rex v. Inhabitants of Devon, 14 East, 477. The case of Russel v. The men of Devon, 2 D. and E, 667, is a leading case, and it was there decided that no civil suit could be sustained against the inhabitants of a county generally, for breach of a public duty. The court however, in the delivery of its opinion, and by way of argument, said that the county was not a corporation ; nor was there any corporate fund out of which, the damages if recovered, could be made. In this, the counsel contended there is a difference between that case and the present. But it may properly be answered in the first place, that it was not upon that ground only, that the court rested its opinion ; it was rather matter thrown out, arguendo. And in the second place, I am not sure that there is any corporate fund, ou.t of which, the board of freeholders could rightfully pay these damages, if any be recovered. The damages, it is alleged, have accrued by reason of their official misconduct, and that being the case, they must be answerable personally, if at all. They cannot call upon the county to respond over to them, where they are bound by law to do a particular thing, and wrongfully neglect it. The county and the funds of the county stand between them and harm, where they do their duty as its public agents; *117 bat not in those cases where they neglect or refuse to do their duty; and damages are recovered against them by reason thereof.
But it was further contended, that our statute had changed the whole common law principle; that as it had erected a body of men into a corporation, to take the oversight of the business of the county, it had likewise given a special remedy in all eases against them. The board of chosen freeholders, is charged by statute, with the superintendence of county bridges — is incorporated, and made liable in express language, “to sue and be sued-,” and this, it is contended, gives plenary powers. But it is clearly demonstrable, I think, that there is nothing in this position.
The words “ to sue and bo sued,” give to this artificial person, no greater powers, and subjects it to no greater responsibilities, than as if they were natural persons charged with the same duties. A corporate body is merely a legal or artificial person substituted for a natural person. Ang. and Ames, 58. These words of the statute, are oí' no manner of importance; and although it is usual in the charters granted by this state, to corporations to insert this clause; yet it might be rejected as surplus-age, without interfering in the slightest degree with their corporate powers. The simple act of incorporation, gave to the board of chosen freeholders, as a necessary incident, the right to sue and be sued. It is one of the essential and ordinary incidents to every corporation. 2 Kent’s C. 277, 278; 1 Black. C. 475-6; Kyd. on C. 69; Ang. and Ames on C. 58. An undue importance therefore is attached to this power, as conferred by the statute. Though this corporation may like a natural person, sue and be sued, yet this suing and being sued, must always be in reference to matters and things within the legitimate scope and object of its creation. Ang. and Ames, 207.
The better and the modern opinion is, that a corporation may be held liable even for its torts, in a special action upon case, for a neglect of duties, in particular cases, and even in trespass for the authorized torts committed by its agents, Yarborough v. The Bank of England, 16 East, 6; Chestnut Hill &c. Turnpike Co. v. Rutler, 4 Serg. and R. 16; Grey v. The Portland Bank, 6 Mass. 364; but all these powers and liabilities are attached to corporations, by the policy of the law, which seeks, as far as possible, to make them answerable to the same extent as individuals. Be *118 cause the statute says, they may sue and be sued, it by no means follows that they may be sued for every thing, but it means that they, this artificial body., may be sued like an individual, for all those matters and things, for which they are civilly liable. We' must look to general principles, for the purpose of ascertaining the extent of that civil and legal liability. If, for instance, the statute should give to a slave, the power to sue and be sued, surely that power must be exercised with reference to existing laws. He would be liable it is true, but to such an extent and in such a way only, as every other person in the community. There is nothing therefore, I repeat, in this power to sue and be sued, which will charge these defendants, as a corporation, with any civil liability which a natural person charged with like duties, would not have been equally subjected to. This principle being settled, we have abundant negative authority upon the question now before us.
From the earliest times both in England and in this country, the immediate duties of attending to the erection and repair of public bridges, have been placed by law upon some public officer chosen for that purpose: and yet not a solitary case is on record, of such public officer having been held liable for damages to individuals by reason of a neglect of his public duties. As before said, the uniform remedy has been by indictment or presentment, and even that, not against the officer himself.
Nor have the counsel cited a single case in this country, which even bears upon the question.
To make an overseer of the highways, indictable for neglect of his public duties, it was necessary that a special act of the legislature be passed, Rev. L. 622, see. 18, and by the 27th see. of the act concerning roads, 'he is subjected to a fine: .there is no common law liability. In reference to the board of chosen freeholders, I am not aware that there is now, or ever has been a statute subjecting them to indictment, though they are by special enactment subjected to a penalty of fifteen dollars if they refuse to accept the office, and if after acceptance they refuse, after due notice, to perform certain duties required by the act concerning roads, Rev. L. 57Ó, they are liable to forfeit sixteen dollars for the use of the county. The liability under these statutes, is the only civil liability resting upon them, for neglect of their duties *119 to the public. If they be liable at common law, to a civil suit for damages by reason of defective bridges, so must the overseers of the highway be equally liable for damages by reason of defective highways. The same principle must cover both. They are both capable of suing and being sued. But overseers of the highway, or officers charged with exactly the same duties, have existed from time immemorial, and yet they never have been held liable, except under special statutes. I desire to call attention to the case of Bartlett v. Crosier, 15 John’s. R. 250, and to the same case in Error, 17 John’s R. 439 ; and more at large than I otherwise should, as no American case has at any time been cited, and it was thought there' was none upon this point. It was an action on the case, and the declaration charged that the defendant below was an overseer of the highways, duly commissioned, sworn &c. and that he had taken upon himself the execution of h-is office ; but not regarding, and neglecting his duty, he negligently and wilfully suffered a certain bridge in his district, and on a public highway therein, to be and remain for the space of three months, broken, dangerous and unfit to be travel-led over &c. That during the time the plaintiff was driving his mare over the bridge, and by the defendant’s wilful neglect, she fell through and broke her leg. These being the facts, it was contended for the overseer, that no civil action lies at common law for not repairing a bridge or road; but the Supreme Court of New York sustained the action, and Spencer, Ch. J. in delivering the opinion, said it was “a general principle of law, that wherever an individual has sustained an injury by the mis-feasance or non-feasance of an officer, who acts or omits to act contrary to his duty, the law affords redress by an action on the case adapted to the injury j and he cited Townsend v. The Susquehanna Turnpike Co. 6 J. R. 90. The above principle is the same contended for in this case, and upon which, the plaintiff must recover, if at all. This ease was carried into the court of Errors, and we have the opinion of Ch. J. Kent, concurred in by the whole court, reversing the judgment below, and denying the doctrine of the Supremo Court. The whole opinion has a strong bearing upon the case now before us, not upon the general question of liability at common law only, but as connected with the provisions in detail, of our statutes. He, among other things, remarks *120 that it could never have been the intention of the legislature to introduce a new rule, or they would have been explicit, and that to sustain an action at the present day, would be a surprise. He says further, that “ where the law renders a public officer liable to special damages for Deglect of duty, the cases are those in which the services of the officer are not uncompensated or coerced, but voluntary and attended with compensation.” These officers in New York, are it appears, like our freeholders, compelled to serve under pain of a forfeiture &c. and perhaps get the same species of allowance, which is merely the per diem wages of a laborer, while they are actually employed.
There is one other matter to which I desire to call attention. It is said that the liability of the board of freeholders, arises at least in some degree, from the statute; and yet it appears to me that it never could have been the intent of the statute to subject them to damages in such a case. There has been no charge so far as I am aware, of any wilful and fraudulent official neglect upon their part; and yet the statute does not make it an absolute duty, that the board repair all bridges, but leaves a discretion to the freeholders — they are “ to consider and decide upon the utility and necessity of erecting, rebuilding or repairing ” &c. Rev. L. 47, see. 1. Non constat, but that they held it unnecessary in the present case, and if they err in judgment, however well meaning, and the plaintiff’s counsel be correct in their argument, they are exposed to all the responsibilities which may arise therefrom. This gross injustice arises from the counsel’s substituting the responsibility of the freeholders, in place of the county, which latter is under all circumstances bound prima, facie to keep the public bridges in good repair, and liable to indictment if it do not.
Other arguments might be drawn from the special provisions of the statute, but they are unnecessary. I am satisfied, no civil action lies in such a case; and the judgment of the Common Pleas must be reversed.