·CLARISSE· MILSTREY AND ARNOLD MILSTREY, PLAIN-
TIFFS-RESPONDENTS, v. CITY OF HACKENSACK AND
LESTER K. FISHBOUGH, DEFENDANTS-APPELLANTS.

Argued December 4, 1950—Decided February 26, 1951.

*Mr. Ralph W. Chandless* argued the cause for .appellants. *Messrs. Chandless, Weller, Kramer & Frank,* attorneys.

*Mr. George F. Losche* argued the cause for respondents.

The opinion of the court was delivered by

HEHER, J.  Clarisse Milstrey seeks damages for personal injuries resulting. from a fall on a public sidewalk of Main

Street in Hackensack, New Jersey, at the southwest corner of Mercer Street. Her husband sues *per quod.* The municipality and its director of public works and engineer, Fishbough, are charged with negligence and the maintenance of a nuisance. There was a jury verdict for the plaintiffs against both defendants; and the judgment thereon was sustained by the Appellate Division of the Superior Court. 8 *N. J. Super.* 221. We certified the cause for appeal on defendants' petition.

This is the factual situation: On October 5, 1948, in midafternoon, Clarisse's heel "caught" in a broken and depressed sidewalk surface, six or seven feet from the curb, as she proceeded on a shopping tour, and she fell violently. There can be no doubt that the sidewalk at this point was perilous to travellers. It was "broken in spots" and there was "quite a hole in it—about an inch and a half or two-inch depression," or so the jury might find from the testimony. The question is whether this was an actionable fault attributable to defendants. There was a Whelan drug store in the first-floor corner premises. The sidewalk was constructed of concrete. Some twenty and a half months before, on January 16, 1947, the defendant Fishbough, acting for the municipality, opened the concrete sidewalk and dug a trench to contain a conduit for the operation of intersectional traffic signals and, after the installation was made, "refilled" the excavation with the broken concrete, which was "rammed down" as a base, and then resurfaced the area with a paving composition known as "blacktop" or "roadrite," "even with" the surrounding concrete pavement. The patched surface was triangular in shape—the long side nine feet, the short side four feet, and the hypotenuse a "curved, rounded corner." This surface disintegrated, while the adjoining pavement remained firm and unbroken, and the ultimate result was the sunken and broken area constituting a constant menace to travellers. The photographic evidence reveals a dangerous condition of long standing; it was not of recent origin.

The complaint alleges that the patched area was "so far out of alignment with the true pavement level as to con-

stitute a danger in its use and a nuisance." But the case was tried on the theory that blacktop is not adapted to the mending of concrete sidewalks and that either because of its unsuitability or negligence in the doing of the work, or both, there was here a subsidence and a breaking of the surface which caused the injury in suit. The point of variance between the *allegata* and the *probata* was not made; and it cannot now be raised for the first time. *Miller v. Stieglitz*, 113 *N. J. L.* 40 (*E. & A.* 1934).

The jury could well have found negligence giving rise to a public nuisance in the course taken here. Certainly, that would be so if the condition responsible for the injury had existed from the beginning; it is nonetheless so because the nuisance did not materialize until later, if that was a reasonably foreseeable eventuality. It was an affirmative act of wrongdoing grounded in negligent construction and a nuisance in legal intendment, actionable when special injury ensued.

Blacktop is a bituminous and stone composition with substantially less resistance than concrete, and therefore less durable than concrete. The city's foreman on the replacement work testified that blacktop is not "as good as concrete," and "doesn't last as long as concrete," but "will last for four or five years." He acknowledged that the city "usually" employed concrete in the repair of a concrete sidewalk "when it is a big job." Another witness, Simpson, a road supervisor for the Public Service Interstate Transportation Company, whose duties required almost daily attendance at the *locus* during the period in question, testified that this was one of the busiest intersections in Hackensack; that "in the beginning, after the (replacement) job was done, it was a perfectly smooth surface," but that "as time went on the depression began to take form"; that he did not know "how long it was until it had sunken a little or worn away, or whatever it was, but it was noticeable." The defendant Fishbough, who supervised the particular project and the sidewalk reconstruction for the municipality, also described the *locus* as "the busiest part of the city." He conceded that blacktop is "not as hard as concrete," and that, while it is used for patching

roads and also for sidewalks "in some places," the city "prefers concrete sidewalks, because most of them are concrete, and for the sake of uniformity; but it is permissible to make driveway aprons of it (blacktop), and places like that, which is the same thing." He said that at the time of the mishap here, the patched surface "was worn down possibly a quarter, or not over ⅜ of an inch"; and it was then decided that "to make a nice job, a good job of it, we would dig out the bituminous concrete and put concrete in and make the sidewalk uniform at that point," which he "accordingly had done." He described the condition of the patched area at the time as "slightly concave," due to "wear and tear" rather than ground subsidence. But he admitted the force of the photographic representation of the *locus;* he sought to minimize it as not a "true picture," but an exaggeration due to the "shadows" attending the taking of the picture on "a wet day."

Plaintiff adduced expert opinion evidence that the reconstruction of the sidewalk was structurally substandard, in that blacktop is much less resistant than concrete and it is impossible to guard against destructive water seepage.

■■ Thus, there was evidence tending to show a subsidence and breaking of the sidewalk surface due to the use of unsuitable material and the mode and manner of construction, and therefore a misfeasance chargeable to the municipality. The disintegration of the patchwork was reasonably foreseeable as a consequence of the structural deficiency, and so there was an unreasonable risk of harm which rendered it a nuisance attributable to the municipality when the danger materialized, actionable as such at the suit of one who thereby sustained special and peculiar damage distinct from the general inconvenience suffered in common with the public at large. It does not matter that the faulty construction did not give rise to an immediate hazard. That would be an illusory distinction at variance with the principle. Where a nuisance as a consequence of the thing done is within the realm of reasonable foresight, the author is liable as the creator of the nuisance when the danger comes into being. It is elementary

that if because of defective construction the site of the patch-work would in all human likelihood become a place of danger, the resultant condition constitutes a common nuisance attributable to the original wrong. There was danger in unreasonable degree, not in keeping with the standard of care imposed by the law for the protection of travellers against unreasonable risk of harm. *Restatement, Torts*, § 282. The risk was reasonably perceptible at the time of the doing of the work, and so the act was wrongful and actionable when the foreseeable condition became a reality and resulted in special and particular damage.

The danger arose from nuisance, even though a nuisance growing out of negligence. While nuisance in its primary signification does not involve the element of negligence as one of its essential factors, a continuous threat to the public by an obstruction or dangerous condition in a highway constitutes a common nuisance, though dependent upon negligence. *McFarlane v. City of Niagara Falls*, 247 *N. Y.* 340, 160 *N. E.* 391 (1928).

A nuisance to a highway consists either in obstructing it or rendering it dangerous. *Salmond on Torts* (10*th ed.*), §§ 53, 69. One of the most familiar instances of nuisance is a highway "out of repair." *McFarlane v. City of Niagara Falls, supra.* At common law, the duty of repairing highways rested upon the inhabitants of the parish, and was enforceable by indictment only, and not by way of action at the suit of an individual, even though he had suffered special damage; and the same rule of exemption applied when the care of highways was transferred by statute to corporate local authorities. A transfer of the duty of repair of roads from the inhabitants at large to a body corporate does not change its nature. After long controversy, the modern authorities in England hold that the transfer does not of itself render the corporation liable to an action for damages for nonfeasance as distinguished from misfeasance, unless so provided by statute. *Guilfoyle v. Port of London Authority* (1932), 1 *K. B.* 336.

The soundness of this immunity from liability under the common law for mere passive nonfeasance—mere omission to repair—has long been the subject of controversy among the English judges; and it was deemed "unsatisfactory" by Humphrey, J., in the *Guilfoyle* case, *supra,* decided in 1932. But the exemption does not extend to an active misfeasance—a positive act by which a danger is wrongfully caused in the highway and by which the plaintiff has come to harm. Local authorities are saved from civil liability for merely failing to do what ought to have been done, but are liable at common law for doing that which ought not to have been done. *Russell v. Men of Devon* (1788), 2 *Term. Rep.* 667; *Foreman v. Mayor of Canterbury* (1871), *L. R.* 6 *Q. B.* 214; *Shoreditch Corporation v. Bull* (1904), 90 *L. T.* 210; *Salmond on Torts,* § 70. "Once establish that the local authority did something to the road, and the case is removed from the category of nonfeasance. If the work was imperfect and incomplete it becomes a case of misfeasance and not nonfeasance, although damage was caused by an omission to do something that ought to have been done. The omission to take precautions to do something that ought to have been done to finish the work is precisely the same thing in its legal consequence as the commission of something that ought not to have been done, and there is no similarity in point of law between such a case and a case where the local authority have chosen to do nothing at all." *McClelland v. Manchester* (1912), 1 *K. B.* 118. Lush, J., there held that when a local authority "undertakes and performs a duty, whether they are bound by statute to do so or whether they have an option to perform it or leave it unperformed, however it arises, they are bound to exercise proper and reasonable care in its performance, and that there is no difference in this respect between a public body and a private individual who does an act which if carelessly done may cause injury to others." One who undertakes to do a piece of work must do it with reasonable care; and he is liable for a breach of the duty in that respect. *Thompson v. Bradford Corporation* (1915), 3 *K. B.* 13. Active misfeasance is the test of liability in the case of a municipal corporation. *Foreman*

*v. Mayor of Canterbury, supra.* A "negligent act of commission" whereby a road becomes dangerous is a misfeasance. *Attorney General v. Todmorden Borough Council* (1937), 4 *A. E. R.* 588.

These common-law principles obtain in New Jersey. A municipality is accountable in tort for its own positive misfeasance, generally classified as "active wrongdoing" in the cases, but not for mere nonfeasance. The corporate body is not chargeable with the negligence of its officers or agents in the performance of a public duty laid upon it by law, unless the wrongdoing is its own by direction or participation. "Active wrongdoing" and "positive misfeasance" have the same essential connotation. Misfeasance is the wrongful and injurious exercise of lawful authority, or the doing of a lawful act in an unlawful manner. *Hart v. Freeholders of Union,* 57 *N. J. L.* 90 (*Sup. Ct.* 1894); *Allas v. Rumson,* 115 *N. J. L.* 593 (*E. & A.* 1935). In *Cochran v. Public Service Electric Co.,* 97 *N. J. L.* 480 (*E. & A.* 1922), the old Court of Errors and Appeals ruled that the failure of the municipality to light a safety isle at night rendered the structure a nuisance growing out of negligence and its own positive misfeasance. Compare *Freeholders of Sussex v. Strader,* 18 *N. J. L.* 108 (*Sup. Ct.* 1840); *Olesiewicz v. Camden,* 100 *N. J. L.* 336 (*E. & A.* 1924); *Florio v. Jersey City,* 101 *N. J. L.* 535 (*E. & A.* 1925). In the case last cited, where liability was alleged against the municipality for the negligent operation of its fire truck, Mr. Justice Kalisch for the Court of Errors and Appeals found the rule under our cases to be that a municipality is not liable for "negligence that is nothing more than nonfeasance," nor for "negligent acts of misfeasance" by its servants or agents or a public officer performing duties strictly public, unless the misfeasance is committed or directed by the municipality itself.

The common-law rule that a municipality is liable for the creation of a nuisance in a public way by its own positive misfeasance is embedded in our jurisprudence. *Town of Union v. Durkes,* 38 *N. J. L.* 21 (*Sup. Ct.* 1875); *Hart v. Freeholders of Union, supra; Kehoe v. Rutherford,* 74 *N. J.*

L. 659 (*E. & A.* 1907); *Fisher v. Nutley,* 120 *N. J. L.* 290 (*E. & A.* 1938); *Jaixen v. Hargreaves,* 127 *N. J. L.* 370 (*Sup. Ct.* 1941); *Fredericks v. Dover,* 125 *N. J. L.* 288 (*E. & A.* 1940); *Lovett v. Keyport,* 133 *N. J. L.* 122 (*E. & A.* 1945); *Truhlar v. Borough of East Paterson,* 4 *N. J.* 490 (1950). A municipal corporation is not answerable for damages "incident to the road falling out of repair." *Bucka-lew v. Freeholders of Middlesex,* 91 *N. J. L.* 517 (*E. & A.* 1918). But where, as here, the settlement and breaking of a patched pavement surface are due primarily to structural fault that could have been avoided by the exercise of reasonable care, and are not the normal incidents of wear and tear or public use, the resulting danger constitutes a nuisance in legal intendment, for it was the reasonably foreseeable consequence of the structural deficiency. *Gainfort v. 229 Raritan Avenue Corporation,* 127 *N. J. L.* 409 (*Sup. Ct.* 1941). There is in such circumstances the default which is the essence of negligence. The excavation here was made to serve a purpose other than the repair or maintenance of the road itself; and the mischief arose from want of due care in the restoration of the road. The case of *Garvey v. Public Service Coordinated Transport,* 115 *N. J. L.* 280 (*E. & A.* 1935), is analogous. There, the hazard consisted of a hole in the sidewalk resulting from the decay of the butt of a wooden pole severed at ground level, to avoid damage to and the need for the replacement of the surrounding pavement; and it was held that the deepening of the hole by the lessening of its bottom resistance through the operation of nature's process of decay was a circumstance reasonably to be apprehended, and the consequent risk to travellers constituted a nuisance. It was recognized by Chancellor Walker in *Buckalew v. Freeholders of Middlesex, supra,* that if the repairs to the road were made "with material which in and of itself would cause injury, a different question would doubtless be presented." It is fundamental in the common law that the author of a nuisance is liable for its injurious consequences until the danger is removed.

The English judges still find that the application of the common-law rule exempting the local highway authority from liability for mere nonfeasance, and the classification of acts of misfeasance as distinguished from nonfeasance, involve questions of very considerable difficulty. A local authority who is also a road authority may be liable when acting not as a road authority, but in some other capacity, for what may be regarded as nonfeasance. *Shoreditch Corporation v. Bull, supra.* There, a trench was dug in a highway by a sanitary authority who was also the highway authority; and argument was made that, since the jury found that the work was properly finished after the trench was completed, the later negligence was a mere nonfeasance by the highway authority for which it would not be responsible. Lord Chancellor Halsbury held that "if there was anything wrong * * * in the mode of carrying out the work * * * or if in any other way the thing that was being done was negligently done," it was an act of misfeasance "for which the local or road authority under whose authority the thing was done was responsible." He declared: "I deprecate very much the notion that you can begin an operation which interferes with the ordinary and normal condition of the roads and then by reason of having different duties cast upon you you can treat that as a separate operation, so that at one point of time you may be responsible in one capacity or not responsible in one capacity and at another point of time you are, and you may hand over the completion of the operation to an authority which is not responsible at all. That would be a sort of metaphysical inquiry into which I am loth to enter. * * * The moment the structure of the road is interfered with, and it comes within the ambit of the operation commenced by the person who is entitled to interfere with the structure of the road, then, until that road is restored into the condition in which it was before that alteration of its structure began, it seems to me the person who interfered with it is responsible for a misfeasance."

The principle was applied by the Court of Appeal in the recent case of *Newsome v. Darton Urban District Council*

(1938), 3 *A. E. R.* 93. There, the local sanitary authority and the local highway authority were one. In July, 1933, they dug a trench in a highway for the purpose of executing certain drainage work. The excavation was filled in, and in 1935, when the surface was tar-sprayed and chippings were rolled in with a steam-roller, the surface was said to be level. In 1936, a depression had formed at the place where the work had been done; and the jury found that the highway at this place was dangerous to those using it with due care; that, although the original work was executed without negligence, the dangerous condition was due to interference with the structure of the road by the defendants, whose duty it was, by reason of that act, to restore the road to the condition in which it was before such interference, including the remedying of a subsequent subsidence; and that the defendants were negligent in not discovering and taking steps to remedy the danger, and this negligence amounted to misfeasance. This although it was not established that there was any settlement until after the expiration of two years from the date of the excavation, and the mishap complained of occurred as long as three years after the excavation. The principle apposite to the case in hand was thus stated by MacKinnon, L. J.: "The primary rule is that the highway authority is liable for acts of misfeasance, and not for the results of nonfeasance. If a defect arises in a highway only as the result of the friction of traffic and the operation of natural causes, and that is not remedied by the authority, that is a defect arising only from nonfeasance. Where, however, the authority, either in its capacity as highway authority or otherwise, does something to the surface of the highway, and that which it does is, in addition to the friction of traffic and the operation of natural causes, the origin of the defect which they do not remedy, then the defect may be regarded as the result of misfeasance, and not merely nonfeasance." The judge found that this was the result of the principle laid down in the *Shoreditch* case, and that the difference in time between the doing of the act and the disaster arising from the defect was simply one of degree and of fact that did not affect the operation of the prin-

ciple. This is the principle that charges the municipality here with the injurious consequences of the nuisance that eventuated from the original negligence. It is a rule of causation grounded in reason and inexorable logic which is of the essence of the common-law doctrine of liability for fault.

The misfeasance established by the verdict and judgment here is imputable to the municipality, or so the jury might well find. The material was supplied by the local governing body; and its use for such patchwork was in keeping with long-standing practice where the surface replacement was "a small job." The work was performed under the supervision of the city's engineer in accordance with the accepted practice. The municipality was responsible for the policy which made for structural insecurity; the misfeasance was its own. Compare *Lovett v. Keyport, supra; Olesiewicz v. Camden, supra; Cockran v. Public Service Electric Co., supra.*

In England, local governmental agencies are now deemed liable under common-law principles for the misfeasance of its servant, although not for his nonfeasance. *Mersey Docks v. Gibbs, Law Rep. 1 H. L.* 93 (1866); *Foreman v. Mayor of Canterbury, supra.*

And Fishbough is also liable to an action for the nuisance created by his hand, even though the work was done for the municipality. The performance was under his direction. It is the settled rule in this State that public officers have no protection "from the consequences of their misfeasance in the performance of their public duties," as distinguished from a mere negligent omission or nonfeasance. *Florio v. Jersey City, supra.* There is no reason of policy at common law or by statutory declaration for the exoneration of municipal officers from civil liability for their active misfeasance in the performance of their public work. As in the case of the municipality itself, there is no liability for mere passive nonfeasance unless it arises by statute. The common law affords local public officers no exemption from liability for an "act of his own personal negligence." *Foreman v. Mayor of Canterbury, supra.* For a personal act of misfeasance, a public officer "should be held liable to one injured by

it as well when in the performance of a public duty as when otherwise engaged." *Moynihan v. Todd,* 188 *Mass.* 301, 74 *N. E.* 367 (1905). This rule has general acceptance in this country. 37 *Am. Jur.* 887.

Error is assigned upon the failure of the trial judge to charge this request:

"A pedestrian on a sidewalk is bound to exercise ordinary care not only to avoid dangerous places known or '*seen*' but also those of the existence of which he is ignorant."

The jury were instructed, not once but several times, that if Clarisse was guilty of negligence which contributed to her fall and injury, there could not be a recovery, and that there was such contributory negligence if she failed to exercise due care for her own safety; also that recovery would be barred if she "assumed the risk of a danger known to her in passing over the sidewalk." But there was this instruction also:

"A person traveling along a sidewalk has the right to presume, until, of course, the contrary appears to him, to his knowledge, that there is no dangerous impediment in any part of the work, or, incidentally, the highway. This principle applies to all interferences with the safety of travel arising from temporary uses of the sidewalk or highway, that are not normal, and permanent incidents thereof, and it relieves persons passing along the sidewalk or highway from any obligation to look for such interferences with travel."

The criticism is that it is common knowledge that "all sidewalks suffer from depressions of varying degrees," and so it was error "to limit the jury on the question of the ordinary care required of pedestrians." There was no exception to the charge itself; and the inquiry is whether the failure to charge the request served to impair defendants' substantial rights. We are clear that it did not.

The subject matter of the request was charged in substance. It would seem that the request is not accurately phrased, and might very well lead to confusion, for the standard of conduct is not the exercise of ordinary care to avoid dangerous places "the existence of which" the traveller "is ignorant," but rather such care for his own protection as a

reasonably prudent person would have exercised under like circumstances. One's right to protection from the negligence of others carries with it the duty of reasonable care for one's own safety. The inquiry is whether the traveler, by the exercise of ordinary or reasonable care, would have discovered the danger and avoided it. At all events, it was proper to qualify the request by the instruction that the traveller has "the right to assume that there is no dangerous impediment or pitfall" in the sidewalk. *Saco v. Hall,* 1 *N. J.* 377 (1949).

And there was no error in the rulings on evidence. In one case, the point of irrelevancy raised at the trial is plainly without merit; in the second, the evidence of the repair of the sidewalk after the mishap in suit had come in without objection from another witness. And the ground of the objection to the particular question was that the evidence "is not material at this time." Later on, a photograph showing the repairs was admitted into evidence without objection; and the repairs were also proved by defendants' own counsel on the direct examination of the defendant Fishbough.

The judgment is affirmed.

CASE, J. (dissenting). The complaint charged that the defendants, having removed a portion of the sidewalk, negligently and carelessly replaced the same, on January 16, 1947, so out of alignment with the true pavement level as to constitute a danger in its use and a nuisance. There were no amendments. No proof was adduced that when the sidewalk was replaced it was out of alignment. There is proof that on October 5, 1948, the day of the accident, there was a subsidence or depression and that the replaced pavement was "kind of broken in spots, and one particular spot had quite a hole in it." A depression was there before that day; how long, does not appear. There is no proof of earlier breaking or holes. The only proof bearing upon a wrongful choice of materials used in the repair came from one Schweitzer and was admitted, erroneously as I believe, over the strenuous objection of the defendants who urged that whether or not the paving material conformed to standards was entirely

irrelevant to the issue. At the close of plaintiff's case defendants moved for a dismissal, naming as one of the grounds that plaintiff had failed to prove her case. The court denied the motion upon the reasoning that a defect appearing later, because of the application of a blacktop surface, could be reflected back, in point of liability, to the time of the use of the material; and that could have been a proper ruling if the pleadings had been framed to raise the issue. But I do not consider that irrelevant proof, admitted over objection, can be interpreted as changing the issue. Defendants, on their own case, carefully and convincingly proved that when the repair work was done the new pavement was thoroughly bound against the adjoining concrete sidewalk and presented a smooth, flush surface in complete alignment therewith. That met the issue. It is true that inasmuch as the repair material was Roadrite, a variety of blacktop, there was proof of the characteristics of that pavement; under the court's ruling it could hardly have been otherwise; but, in view of what had gone before, that ought not to deprive the defendants of their right to a trial of the issue framed by the pleadings.

Even if we assume that the use and effect of the blacktop pavement were in issue, I consider that the plaintiff did not prove her case.

Under the common law there was no liability, except by special statute, on the part of either municipal government or of public officer to a civil suit for damages arising out of the negligent performance of a governmental duty, including the failure to keep either bridges or roads in proper repair; an immunity which arose out of ancient precedent and public policy. *Cf. Freeholders of Sussex v. Strader,* 18 *N. J. L.* 108 (*Sup. Ct.* 1840); *Livermore v. Board of Freeholders,* 31 *N. J. L.* 507 (*E. & A.* 1864); *Hart v. Freeholders of Union,* 57 *N. J. L.* 90 (*Sup. Ct.* 1894). A learned and thoroughly documented opinion reviewing the English and American cases, including our own *Strader* and *Livermore* cases, is *Hill v. Boston,* 122 *Mass.* 344 (*Supreme Judicial Court,* 1877). The act sued upon in the instant case was in connection with the maintenance of traffic lights, and with the repair of roads,

and, so, was a governmental operation. *Vickers v. Camden,* 122 *N. J. L.* 14 (*E. & A.* 1938) ; *Casey v. Bridgewater Township,* 107 *N. J. L.* 163 (*E. & A.* 1930).

That broad common law immunity has been modified in this State to the extent that although a municipal corporation charged with performance of a public duty is not, in its governmental functions, liable to an individual for neglect to perform or for negligence in performance whereby an indictment would lie, nevertheless, where the municipal corporation had been guilty of active wrongdoing, as distinguished from mere negligence, the *corporation* should not be immune from liability for private injury. That principle was applied in such cases as *Hart v. Freeholders of Union, supra; Kehoe v. Rutherford,* 74 *N. J. L.* 659 (*E. & A.* 1907) ; *Ennever v. Bergenfield,* 105 *N. J. L.* 419 (*E. & A.* 1928), and *Allas v. Rumson,* 115 *N. J. L.* 593 (*E. & A.* 1935). But I do not find that the immunity has been modified as to the employee through whom the municipal corporation accomplishes the fault.

Thus, in its governmental operations, a municipal corporation may not be charged with passive negligence, a failure to do something, but may be charged with liability for active wrongdoing. To make practical application: the city could be liable if in making the repairs it placed the new work out of alignment with the old; it would not be liable if the negligence consisted, not of something done in the repairing, but in failure to take care of a condition arising later.

There is little to be gained from an analysis of the general testimony. It is enough to say that without the testimony of Schweitzer, mentioned above, there was no substantial proof that the material used was not proper for the purpose to which it was applied; indeed the remaining proof on the subject was *contra* that proposition. That witness testified as an expert and the gist of his testimony was that the use of blacktop does not conform to the standard for the repair of concrete sidewalks except for temporary repair, because of the difficulty in applying the proper weight or pressure to obtain compaction "so it would tend to leave openings in there, allow the

water to get through under the present sidewalk and probably would tend to unravel somewhat on the edges against the concrete." The witness knew nothing about the repair work under litigation, he was not asked about it and he did not attempt to testify with respect to it, even by hypothetical question and answer. *Cf. Schwartz v. Howard Savings Institution,* 117 *N. J. L.* 180 (*E. & A.* 1936). His testimony was strictly in the abstract, with no application by him to the facts of the case, and it rested wholly upon two asserted propositions; first, that blacktop, otherwise an acceptable material, could not easily be compacted in a patch, and, second, that when compaction is not had, it is difficult to bind with the adjoining concrete and water seepage, with the named results, might follow. Passing by the theory advanced by the witness, it does not factually appear that adequate compaction was not had, nor does it appear that any of the results attributed by him to poor compaction here existed. There is no proof that there were openings, at the time of the accident or otherwise, between the blacktop and the concrete, no proof of the seepage of water or that the conditions actually existing resulted from the seepage of water, or that the blacktop unraveled on the edges against the concrete.

Only the choice of material is attacked. That material was admittedly proper for the making of temporary repair, and the only limit placed by any of the testimony upon the period during which it may reasonably be expected to last was four or five years.

The attempt to establish a "standard" was an unsuccessful and spurious resort to a principle that does not fit the case, as though every human undertaking may be reduced to a simple "standard" or "non-standard" in determining liability. None of our decisions holding for liability are on the narrow issue here presented. In *Fredericks v. Dover,* 125 *N. J. L.* 288 (*E. & A.* 1940), the facts included the laying of a metal gutter cover at a dangerous pitch, and in *Newman v. Ocean Township,* 127 *N. J. L.* 287 (*E. & A.* 1941), which perhaps of all our cases comes nearest to this one, the concrete mixture

was of inferior quality and there was faulty workmanship in that the curb had been laid without proper foundation, resulting in a condition whereby a portion of the curb "tipped" and struck plaintiff in the leg.

In the absence of any statutory restriction it is for the highway authority to decide what materials are to be used in the construction or repair of highways, and the use of a material which makes a temporary but not a permanent repair is not active wrongdoing. *Buckalew v. Freeholders of Middlesex,* 91 *N. J. L.* 517 (*E. & A.* 1917). In that case the freeholders were sued upon the theory that the acts constituted an active wrongdoing; and the action arose long after the liability of a governing body for active wrongdoing had been developed. (*Hart, supra,* 1894; *Kehoe, supra,* 1906.) The close pertinency of the case is that it was an unsuccessful effort to fasten wrongdoing upon a governing body because, in actually making a repair, they used sand, a material which produced only temporarily satisfactory results, whereas they could, or should, have used cement and so made a measurably permanent job; and some support for plaintiff's case was sought, as here, in the fact that later a more permanent repair was accomplished with concrete. The decision is a complete answer to the argument that once a local authority does something to a road or a sidewalk liability attaches. If there is a variance in the view of the common law as expressed in our cases from the views expressed elsewhere, I can only suggest that this jurisdiction has been developing its own conception of the common law for 175 years and that such a variance may well exist without prejudice to our own decisions.

My conclusion on that phase of the case is that the expert testimony was not sufficiently integrated with the facts to have any effect on the finding, and that therefore no active wrongdoing was proved; that it was within the discretion of the defendants to select the material to be used and that the selection and use of a material not the best do not put them open to suit; that the defendants were clearly not guilty of the only wrong charged against them in the complaint; and that the failure to remedy such irregularity as later developed

was not only not complained of but was a passive negligence for which suit does not lie.

Our courts have uniformly protected public bodies and their officers from a mistaken application of the principle of active wrongdoing, *cf. Ansbro v. Wallace,* 100 *N. J. L.* 391 (*E. & A.* 1924); *Callan v. Passaic,* 104 *N. J. L.* 643 (*E. & A.* 1928); *Vickers v. Camden, supra; Truhlar v. Borough of East Paterson,* 4 *N. J.* 490, 496 (1950).

For the reasons stated I consider that the denials of defendants' motions to dismiss, made at the close of plaintiff's case and at the close of the entire case, were error.

I further suggest that, although the ancient immunity to both municipality and municipal employee no longer holds as to the municipality where the latter has been guilty of active wrongdoing, our courts have not, as I believe, terminated, and in the public interest ought not to terminate, the immunity of the employee where the wrongdoing is by the municipality itself, for which the municipality is answerable, and the act of the employee is an innocent compliance with his duty to his employer; wherefore it is inconsistent in this case that Fishbough, in addition to the city, should be held liable. We must, of course, distinguish between the employee or officer of a municipal corporation and the employee of a private person, whether individual or corporation (*Clark v. Cliffside Park,* 110 *N. J. L.* 589 (*E. & A.* 1933); *Whalen v. Pennsylvania Railroad Company,* 73 *N. J. L.* 192 (*Sup. Ct.* 1906)), and particularly as to those cases where the responsibility of the private employer is derivative, arising out of the negligence of the employee strictly upon the theory of *respondeat superior.* It is the law in most jurisdictions, as here, that a municipal corporation is not held under the rule of *respondeat superior* for the acts of its officers where the act is in a governmental function, whether the officer receives his authority by statutory law or from the municipality. (See 19 *R. C. L., Municipal Corporations, p.* 1107, § 390, and cases cited in Notes 17 and 18.)

The city was found guilty of active wrongdoing. That is implicit in the judgment against it. It could not lawfully

have been found guilty if Fishbough had acted outside of his authority and committed an independent misfeasance. Fishbough and Fishbough alone would have been responsible in such a circumstance. *Jersey City v. Kiernan,* 50 *N. J. L.* 246, 251 (*Sup. Ct.* 1888) ; *Florio v. Jersey City,* 101 *N. J. L.* 535 (*E. & A.* 1925) ; *Condict v. Jersey City,* 46 *N. J. L.* 157 (*E. & A.* 1884). In general, a municipality is not liable for the acts of its officers done in matters strictly public. *U. S. Mortgage Title and Guaranty Co. v. Teaneck Township,* 128 *N. J. L.* 114 (*E. & A.* 1941). There is nothing to show that Fishbough was acting under a public duty directly imposed by statute upon him as an officer; and the city would not have been liable for a tort committed by him in such case. *Allas v. Rumson, supra, p.* 596. The complaint alleges that the city committed the tort and that it acted through Fishbough as its agent; and the exclusion, to which I have just alluded, of other theories for liability bring us to just that result, namely, that the judgment is against the city because of its own act and that Fishbough's presumed liability arises in that he was the agent of the city in carrying out the latter's direction. There is the flavor of injustice in holding a city employee responsible for carrying out the policies of the city government in a matter that does not, in any of its phases, involve wantonness, malice, abuse of discretion or excess of authority but is simply an error in judgment by the city in selecting one material rather than another of more enduring quality. The argument that an injured person should not be deprived of recovery, which was the instrumental factor in taking immunity away from the municipality, does not here apply. Liability by the employee is not essential to recovery by the person injured, because the city is liable; and such liability by the employee is not a necessary incident to the law since the act is within those immunities which the common law gave to both municipal corporation and public officer and which the modern cases have taken from the municipal corporation but not, so far as my study of the cases in this jurisdiction has shown, from officers with respect to personal liability for acts of this nature done by them at the behest of the

employing municipal corporation. The reasoning given by the Supreme Court of Errors of Connecticut in *Wadsworth v. Town of Middletown,* 109 A. 246 (1920), on a somewhat different issue is pertinent here:

"Where the discretion has been exercised erroneously but in good faith through an error of judgment, the public officials should not be required to pay damages for his acts. The affairs of government cannot be conducted with absolute exactitude, and public officials cannot be expected to act in all cases with certain judgment. Timidity and doubt would govern their performance of public duty if they acted in the consciousness that personal liability might follow no matter how closely they followed their best discretion."

It is not an answer to say that a judgment creditor with two debtors, the city and the employee, will enforce against the former only and not against the latter, or that, if the employee is obliged to pay, the city will reimburse him. That may not happen. This is not a case to which the theory of *res ipsa loquitur* applies. The plaintiff must prove all the elements of liability. Take as a hypothesis, which is contradicted by no proof, that the governing body, either directly or through its city manager, an official with extensive powers (*R. S.* 40:82–4) directed that work of such nature, or, specifically, this particular job, should be done with "Type A Roadrite," and furnished that and no other material for the work. What was Fishbough—or, to make it general, what is any city employee—to do in such a case? It is not difficult to foresee a development which will not be in the public interest. Will capable men of financial responsibility take public employment if it entails personal liability for acts of that nature? I cannot certify that nowhere in the reports of our courts of last resort is there an instance of a public employee, in parallel circumstances involving a fault by the city itself in a governmental function, being held liable where the governing body, at whose behest the employee acted, is originally liable; but counsel have not cited such a case, the majority opinion has not, and I know of none. I am not, of course, taking the untenable position that a public employee should not be held liable for his own independent wrongs.

I believe that, on well established public policy, the motion to dismiss should have been granted as to Fishbough.

Whatever the strict law may be on the matters I have discussed, certainly, as it seems to me, the issues and the proofs were such that the duty upon the plaintiff to use ordinary or reasonable care should have been clearly defined to the jury; and that was not done.

Defendants made the following request to charge on the question of contributory negligence:

"A pedestrian on a sidewalk is bound to exercise ordinary care not only to avoid dangerous places known or seen but also those of the existence of which he is ignorant."

The request was denied. The court charged that the jury should determine whether or not the plaintiff was guilty of contributory negligence which contributed to the happening of the plaintiff's injury, and that, if she were, that negligence would bar her recovery; but it did not charge upon what the duty of the plaintiff in that respect was except contra as follows:

"A person traveling along a sidewalk has the right to presume, until, of course, the contrary appears to him, to his knowledge, that there is no dangerous impediment in any part of the walk, or, incidentally, the highway. This principle applies to all interferences with the safety of travel arising from temporary uses of sidewalk or highway, that are not normal, and permanent incidents thereof, and it relieves persons passing along the sidewalk or highway from any obligation to look for such interferences with travel."

The court's charge must, of course, be understood, and the jury must have understood it, as directed toward the facts of this case, not to those of some other case or to some imaginary happening with which the litigation is not concerned. That the judge so intended is clear from the record. He had, a few minutes before, during the final argument for dismissal said to counsel:

"The only thing that would prevent her from recovering, it seems to me, would be the assumption of the risk of a known danger; if she knew of the danger, knew it was there, and assumed the risk of going over it, and fell, then she would have no right to recover."

The request was probably made to overcome the effect of that statement, erroneous as I believe, and to save the defendants from the harm thereof.

The jury might have found that the only irregularity in the pavement was a subsidence not in excess of one-fourth of an inch. Giving effect to the request and the charge as applied to that possible finding, we have it that the court was asked to charge that plaintiff was bound to use ordinary care to avoid harm from a quarter-inch depression even if she did not actually know it was there, and the court not only denied that request but charged the opposite, namely, that plaintiff had a right to presume that the minor depression was not there unless she had knowledge that it was, and that she was relieved from any obligation to look for such an interference. By that standard plaintiff, who is not shown to have suffered from any impairment of her faculties, might have shuffled along without lifting her feet, without exercising that ordinary caution which most people train themselves to use subconsciously, and yet recover because she tripped at a slight unevenness.

In *Van Pelt v. Sturgis,* 102 *N. J. L.* 708 (*E. & A.* 1926), the defendant had requested a charge in almost the precise language of the request before us. It was held on appeal that the refusal of the request was not error because the court had charged in effect that "It was the plaintiff's duty to use such care as a person of reasonable or ordinary prudence might exercise under like circumstances, which included all the surrounding conditions whether previously known to plaintiff or not," and so had sufficiently covered the request. So here the court was not obliged to charge in the words of the request but was, I suggest, bound to charge the principle inasmuch as the request had been made. In *Quimby v. Filter,* 62 *N. J. L.* 766 (1898), the Court of Errors and Appeals said:

"Ordinary care is everyone's duty. I can hardly conceive of a case where no care at all need be exercised. What is ordinary care will depend upon the circumstances and is for a jury's determination. The adjudged cases all recognize the necessity for the use of ordinary care while walking on the sidewalk of a public street if recovery is to be had for injury due to the maintenance of a nuisance, and recognize also that failure to exercise such care may defeat a recovery, although

the existence of the nuisance and its attendant danger may be unknown to the pedestrian."

The decision directly held that a charge limiting the pedestrian's duty to the exercise of care toward the danger which she saw was an emasculation of the defense of contributory negligence and was error. And I think that such is the law in the present case.

Respondent rests upon the statement of this court in *Saco v. Hall,* 1 *N. J.* 377, 382 (1949):

"The traveling public has the right to assume that there is no dangerous impediment or pitfall in any part of it."

The court did not say, and it is clear that it did not mean to say, that such an assumption relieves a pedestrian or any other user of a public way from exercising any degree of care. The question under consideration was whether the trial court had erred in granting a judgment of nonsuit. The opinion was discussing the duty of the person responsible for the condition of a sidewalk, not the duty of the person using it. The sentence is abstracted from a context that has no relevancy to the present issue. In *Durant v. Palmer,* 29 *N. J. L.* 544, 547 (*E. & A.* 1862), a case of flagrant sidewalk nuisance, the court held that ordinary care is that degree of care which may reasonably be expected from a person in the plaintiff's position and which is synonymous with reasonable care, and that reasonable care requires that in all cases the precaution be proportionate to the danger of injury and may vary with the circumstances of every case, and added that as a general rule there can be no recovery in such an action when want of ordinary care is proved.

Expressions akin to that used by the court below may be found in such cases as *Reilly v. B. S. Janney, Jr. & Co., Inc.,* 103 *N. J. L.* 11, 135 *A.* 66 (*Sup. Ct.* 1926), where the defendant had left on the sidewalk a skid or slideway which it had been using in unloading its trucks; *Matheke v. United States Express Company,* 86 *N. J. L.* 586 (*E. & A.* 1914), where a scaffolding had been suspended eight or ten feet above the street level, and other cases of like nature where there

were impediments or pitfalls foreign to a sidewalk or highway as such; but nowhere in our decisions do I find equivalent language with respect to so frequent an incident to a sidewalk as a slight unevenness in the pavement levels or even to pavements which have become cracked or slightly broken. To say that uneven pavements are not a danger to which pedestrians are frequently exposed is to fail to recognize facts as they are. It is common knowledge that a continuous stretch of perfectly level sidewalk pavement is scarcely to be found except where the period of installation has not been long enough for the inevitable ravages of time, weather and use to have had effect. I express the thought that if what was charged is a correct statement of the duty of a pedestrian with respect to lack of perfect alignment in a public sidewalk, municipal corporations and adjoining property owners are in precarious position. They become, in effect, insurers if there is the least irregularity in the pavement.

I understand the rule to be that a person using a public sidewalk is obliged to exercise the ordinary or reasonable care incident to such an operation, and that such care requires the precaution to be proportionate to the danger of injury and is not limited to the dangers which the pedestrian sees. The only dangerous place about which this case turns was the irregularity in the sidewalk and the request, of course, had reference to it. In my judgment the refusal of the request was error and the matter actually charged emphasized the error.

The decision of the court in all respects mentioned extends the limits of liability of government and of persons, as heretofore determined, in sidewalk cases. For the several reasons stated I think the judgment below should be reversed.

Mr. Justice Oliphant and Mr. Justice Wachenfeld authorize me to say that they concur in this dissenting opinion.

*For affirmance*—Chief Justice VANDERBILT, and Justices HEHER, BURLING and ACKERSON—4.

*For reversal*—Justices CASE, OLIPHANT and WACHENFELD—3.