MARGARET KRESS, PLAINTIFF-RESPONDENT, v. CITY OF
NEWARK, A MUNICIPAL CORPORATION, DEFENDANT-
APPELLANT.

Argued December 3, 1951—Decided January 28, 1952.

*Mr. Charles Handler* argued the cause for the appellant (*Mr. George B. Astley* on the brief).

*Mr. John A. Laird* argued the cause for the respondent (*Messrs. Roskein & Laird,* attorneys).

The opinion of the court was delivered by

ACKERSON, J. The plaintiff, Margaret Kress, married and 41 years of age, instituted this action on June 30, 1948, in the former Essex County Court of Common Pleas against the City of Newark to recover damages for personal injuries consisting of a cancerous condition of both hands known as carcinoma. It is alleged that this condition developed from over-exposure to X-ray radiations while she was employed as a technician in the X-ray Department of the Newark City Hospital, established and maintained as a public hospital by the city pursuant to *R. S.* 30:9–16 *et seq.* The gravamen of the complaint is the alleged failure of the defendant city to provide its employee with a reasonably safe place to work. Specifically it is charged that defendant violated its duty in that it "failed to supply proper protective devices, failed to warn * * * plaintiff of the dangerous emanations from said X-ray apparatus and failed to apprise her of .the fact that such safeguards as it did supply were substandard and ineffective." Defendant's answer denied the charges of negligence and set forth two separate defenses, (1) contributory negligence and (2) that plaintiff's exclusive remedy was under the Workmen's Compensation Act pertaining to public employees. *R. S.* 34:15–43 *et seq.*

The action was tried in the Essex County Court, Law Division, in November, 1949 (after the effective date of the Judicial Article of the Constitution of 1947), resulting in

a judgment of involuntary dismissal which, on appeal to the Superior Court, Appellate Division, was reversed (*Kress v. City of Newark,* 9 *N. J. Super.* 70 (1950)) and the cause remanded for a new trial. The case was retried in the Superior Court, Law Division, in June, 1951, resulting in a verdict of $90,000 for the plaintiff. From the judgment entered thereon defendant again appealed to the Appellate Division and, while pending there, we took jurisdiction of the appeal on our own motion.

The present appeal is directed to the trial court's denial of defendant's motion for an involuntary dismissal made after the presentation of all of the plaintiff's evidence, pursuant to *Rule* 3:41–2, and to the denial of defendant's motion for a new trial. *Rules* 3:59–1 and 2 and *Rule* 1:2–20.

The record discloses that Margaret Kress, a woman of limited education (grammar school only), was first employed at the city hospital in February, 1933, as a maid in one of the wards. Seven months later she was appointed and served for four years as monitor. Her duties were to escort female patients to and from the department and prepare them for X-ray. She took no part in the operation of the machines although she testified that she observed their operation and on occasions saw the technicians hold or help her in holding patients during the exposures. In 1937 plaintiff was put to work in the dark room, developing the X-ray films. She showed evidence of mechanical skill and in 1939 was assigned to the duty of taking X-ray pictures as a technician. Plaintiff testified that she was not given a physical or other preliminary examination as to her fitness for this new position; was employed as a technician without any instruction or warning as to safety precautions to be observed, and her only experience prior thereto with respect to the operation of the machines was what she had picked up by watching the other technicians operate them.

Plaintiff produced an X-ray or radiation physicist who had been employed by approximately 50 hospitals to check and advise with respect to the protection from radiation

afforded to personnel and the maintenance of correct procedures to accomplish that end. He testified (apparently without contradiction) to the standard requirements for the protection of X-ray technicians promulgated by the National Bureau of Standards (*Handbook No.* 20) and generally observed in hospitals. These specifications were that: (1) the head of the department is to be responsible for the safety of all employees therein; (2) each employee to be examined physically once a year and given an examination prior to employment, a general examination to determine fitness for this particular work; (3) each to have a blood count every two months, which shall be permanently recorded; (4) each technician to carry a dental X-ray film once every four months and if it shows an appreciable darkening the reason therefor should be investigated; (5) when an X-ray machine is operated the operator should be in an adjacent room or in a lead-shielded booth within the room, and (6) each employee at the time of employment is to be given a copy of these rules and regulations and required to sign a receipt therefor. Dr. Rubenfeld, a specialist in radiology, with wide experience in many hospitals, testified that the foregoing requirements are generally recognized as standard safety measures in hospital X-ray departments. Also, that it is the duty of the person in charge to instruct the employees that they are working in an atmosphere of potential danger, the details of which are outlined in the aforesaid Bureau of Standards' bulletin and they should be furnished with a copy thereof.

There was competent evidence from which it could have been found that there was no routine physical examination or blood count of employees at the Newark City Hospital and it appears that no records were kept concerning such matters during the period in question. It was suggested to the employees that they wear the dental films and report any darkening. No check was made to see that this was done and the technicians were permitted to develop their own films. Mrs. Kress testified she had reported such a darkening

but nothing was done about it and this occurred to her knowledge with respect to two other technicians.

For about two years after beginning work as a technician, Mrs. Kress, in addition to general X-ray work, also used a dental X-ray machine three afternoons a week, principally with school children sent by the board of education, averaging from 20 to 25 patients a day and taking from one to 12 pictures per patient, depending upon their requirements. Often she held dental film in the mouths of children or crippled persons who were unable to hold the film steady and in so doing exposed her hands to the direct beam of the X-ray. In 1941 the children's dental work was removed to the board of health and plaintiff continued to operate a portable unit with which she took X-rays, mainly of extremities in fracture cases, in a room designated as the "portable room." This mobile unit was also used by her up in the wards and during surgical operations. There were two other rooms used for X-ray purposes. There is testimony that the "portable room," contrary to the condition existing in the other rooms, did not have a leaded booth or screen behind which a technician could stand while operating the mobile unit, although the machine itself was lead enclosed and had a timing cord, at least three feet long, attached thereto so the operator could stand that far away during an exposure. Standard Picker machines were used and there is no evidence that they were defective.

Plaintiff frequently exposed her hands to the direct rays of these machines, particularly when it became necessary to immobilize a patient to obtain an unblurred picture. She testified that she did not know and was never told of the danger of exposing herself to the direct beam of the X-ray apparatus; was never instructed to take any safety precautions in her work; was never given any book of instructions or warning, and no safety rules or regulations were posted anywhere in the department. She further testified that if a film was spoiled because a patient moved, she would be called in to see Dr. Santora, the head of the department,

who would say "I don't care how you get them, if you have to sit on the patient you have got to get the picture." Additionally the record discloses that she was not given any physical check-up and she testified that her blood count was never taken prior to the discovery of the carcinoma except on the occasion when she was operated upon for a gall bladder condition while a patient in the surgical department of the hospital. Although there were three X-ray rooms and several technicians, there was only one leaded apron and one pair of leaded gloves in the department and these seem to have been for the use of the doctor when fluoroscoping.

The plaintiff produced three of her fellow employees who had rendered years of service at the hospital during the period in question, two of whom are still employed there. Dorothy Yarrow, a clerk and general helper in the X-ray department testified that she never heard of any instructions being given regarding safety procedures; never saw any rules, regulations or printed matter with reference thereto; the so-called "portable room" was not equipped with a lead screen or guards, and there was only one leaded apron and one pair of leaded gloves. Angela de Angelis, a fellow technician, testified that there were no definite rules laid down for the guidance of anyone; no physical examinations of technicians; the only lectures or instructions given had to do with the technical aspects of taking pictures and had nothing to do with safety procedures, and there were no leaded aprons or gloves available for technicians. Catherine Rice, also a technician who had served five and one-half years in the department, corroborated the testimony of the foregoing witnesses regarding the lack of instructions, warnings, physical examinations, and certain protective devices. She further testified that there were no blood counts and no routine about wearing, developing or evaluating the badges of dental film which were sometimes worn as indicators of excess radiation.

On the other hand Dr. Santora, connected with the hospital since 1936 and assistant medical director and supervisor of

the X-ray and radiology department since April, 1940, testified that on assuming the latter position he found Mrs. Kress doing a good job in the dark room and on the machines and kept her at that work and in 1943 changed her title from that of maid to X-ray technician. He stated that up until the time he became head of the department he did not know what was said or done with regard to instructions concerning safety precautions but he had warned Mrs. Kress against holding X-ray dental films in patients' mouths and had told her generally of the dangers of direct exposures. He also stated that after she had been employed in the department for some time and was preparing for a civil service examination he went through the question of protection with her and warned her that one of the questions would be on protection, and further, that during lectures to internes she and other technicians aided the doctor in charge and received the benefit of instructions. He further said there had always been a lead screen in the "portable room." Dr. Henle, head of the hospital's radiotherapy department testified that she had instructed technicians as to the dangers of exposing themselves to direct X-ray beams. Dr. Pomeranz testified that while connected with the department from May, 1941, to September, 1942, he had given instructions to technicians with reference to safety rules, but no details, occasions or persons were mentioned.

In 1945 Mrs. Kress first noticed brown spots on her hands. These small wart-like irritations or plats on the top of her fingers and hands would sometimes break off and bleed. She called this to the attention of her department head, Dr. Santora, who referred her to Dr. Altman in charge of employees. Dr. Santora suggested that she apply a salve or cream on the brownish area and said that there was nothing to worry about. Plaintiff felt relieved. Dr. Santora did not check to see what caused these symptoms and, according to his testimony, thought the discoloration was due to war-time solutions used in the development of the X-ray pictures. One year later, in August, 1946, a patient, of

whom an X-ray was being taken, accidentally ripped a piece of flesh from one of plaintiff's fingers and in so doing lacerated one or more of the elevated brownish plats thereon, causing the finger to bleed. She was taken to Dr. Henle, a member of the medical staff, who examined the finger and took a biopsy. The laboratory report showed her condition to be squamous cell carcinoma, a malignancy of cancer. She was then referred to the New York Memorial Hospital where the diagnosis was confirmed. Within a few days an operation was performed on plaintiff's left hand. A second operation in February, 1947, was necessitated by further evidence of athropic changes on two of the fingers and part of the thumb of the left hand. A similar operation was performed on the right hand in June, 1949. The last operation was performed in November, 1950. These operations consisted of the removal of the skin on the dorsal surface of the involved fingers and the grafting of skin.

The first point argued by the defendant on this appeal is that the trial court erred in denying its motion for a judgment of dismissal at the close of the plaintiff's case on the ground that the Workmen's Compensation Bureau (now the Division of Workmen's Compensation in the Department of Labor and Industry) was the only forum for the adjudication of her claim. This question was raised on the first appeal in the Appellate Division but was not referred to in its opinion. Defendant now argues that there was a traumatic aggravation of a pre-existing condition of skin cancer, and therefore a compensable injury within the intendment of the Workmen's Compensation Act (*R. S.* 34:15–1 *et seq.*). There is no merit in this contention because there is no evidence whatever that the trauma aggravated an underlying dormant condition. The laceration merely revealed the existence of the carcinoma which, according to the medical experts, resulted from over-exposure to X-ray beams and is a matter of slow development over a period of years, or at least months, depending upon the sensitivity of the particular individual. In other words, this was not a

dormant condition rendered active by trauma, it was revealed by trauma. Therefore any claim under the act would have failed for lack of proof of an injury by "accident" resulting in disability within the intendment thereof. Nor does plaintiff's condition fall within any of the compensable occupational diseases provided for under the act as it stood (see *R. S.* 34:15–31) prior to the amendment thereof in 1949 (*L.* 1949, *c.* 29, *p.* 103, § 2; *N. J. S. A.* 34:15–31), which amendment was after the institution of the present action. While several kinds of occupational diseases were added to the list as compensable by an earlier amendment made in 1945 (*L.* 1945, *c.* 53, *p.* 318, § 1), skin cancer from overexposure to X-ray, such as this, is not among them. We find no error in the denial of defendant's motion for a dismissal of the present action on the ground hereinabove stated.

Defendant further contends that it was entitled to a dismissal of this action at the close of the plaintiff's case because no active wrongdoing on its part was shown. This argument is grounded upon the theory that the city in the operation of the hospital was engaged in the performance of a governmental function in which there would be no liability for the negligence of its officers and agents unless the city itself was guilty of active wrongdoing.

The hospital, as already observed, was established and is maintained by the City of Newark pursuant to *R. S.* 30:9–16, which requires it to be "devoted exclusively to the treatment and relief of the indigent sick and disabled" of the city, and the expense of its maintenance is defrayed from the annual tax levy. Therefore, on the record before us, we conclude that the hospital was established and is maintained for public purposes from which no special benefit or profit is derived by the municipality and consequently the character of its operation is governmental rather than proprietary. The distinction between such types of operation is well stated in *Allas v. Rumson*, 115 *N. J. L.* 593, at *page* 594 (*E. & A.* 1935). While we find no case directly in point in this State, nevertheless, it is generally held elsewhere that the

maintenance of a hospital by a municipality for the purpose of conserving public health, treating indigent patients and applying money receipts to expenses is the exercise of a governmental rather than a proprietary function. See 18 *McQuillin, Municipal Corporations* (*3d ed.*), § 53.86, *pp. 375 et seq.*; 63 *C. J. S., Municipal Corporations,* § 905, *p.* 311. The foregoing conclusion is not altered by the fact that the above statute (*R. S.* 30:9–16) permits suits to be brought against a city maintaining a hospital thereunder, since the language used pertains only to the right to sue but does not change the basis of liability which remains as theretofore.

It is a rule of long standing in this State that a municipality in the performance of a governmental function is carrying out a public duty and, in absence of a statute to the contrary, is not liable for negligence in the performance of such duty except upon proof of active wrongdoing or positive misfeasance chargeable to the municipality itself, as distinguished from mere nonfeasance or neglect. *Allas v. Rumson, supra; Truhlar v. Borough of East Paterson,* 4 *N. J.* 490, 494 (1950). The most recent expression of the applicable principle is to be found in *Milstrey v. Hackensack,* 6 *N. J.* 400, 408 (1951) where we said:

"A municipality is accountable in tort for its own positive misfeasance, generally classified as 'active wrongdoing' in the cases, but not for mere nonfeasance. The corporate body is not chargeable with the negligence of its officers or agents in the performance of a public duty laid upon it by law, unless the wrongdoing is its own by direction or participation. 'Active wrongdoing' and 'positive misfeasance' have the same essential connotation. Misfeasance is the wrongful and injurious exercise of lawful authority or the doing of a lawful act in an unlawful manner."

In view of the foregoing principles, the question before us is whether or not there was evidence of active wrongdoing on the part of the municipality which required the submission of that question to the jury. The city, under the applicable statute, was directly chargeable with the mainte-

nance of the hospital and it had to perform that duty by means of its officers and agents. We think, under the proofs, it was open to the jury to find, if it so chose, that there was a failure of compliance with the recognized standards of practice and procedure for the instruction and protection of departmental personnel against the danger of overexposure to X-ray emanations. There was ample evidence from which it could have been found that the plaintiff, a maid with meager education and experience, was placed in the X-ray department of the hospital to operate technical instrumentalities involving latent potential danger without any examination as to her mental and physical fitness for the work; without any knowledge on her part, or any instruction or warning given to her, then or at any time thereafter, as to the risk involved by exposure to radiation from the X-ray machines and the proper protective procedures to be observed to avoid such dangers; without any physical examination or blood counts, up to the time of the discovery of plaintiff's condition, and without the benefit of adequate protective devices. Plaintiff's work was done under the supervision of the head of the department and his assistants, and it could have been found that it was done in accordance with a long standing practice or policy which apparently continued until the discovery of Mrs. Kress' condition in 1946 and therefore constituted active wrongdoing, as distinguished from an isolated act of omission or neglect. It was likewise open to the jury to find from the evidence that such practices, procedures and conditions were general and had been in existence for such a length of time as to justify the inference that the municipality had notice thereof and by permitting such continuance had actually participated therein, and therefore the active wrongdoing or misfeasance was its own within the holding in *Milstrey v. Hackensack, supra,* and *Allas v. Rumson, supra.* We therefore conclude that the question of whether or not the municipality was guilty of active wrongdoing or misfeasance which proximately caused the plaintiff's injuries was properly for the jury

and consequently there was no error in the trial court's refusal to dismiss the action on the ground above stated.

The issue of contributory negligence (assumption of risk was not pleaded) was likewise, under the circumstances revealed by the record, properly left to the determination of the jury. *Cf. Bacak v. Hogya,* 4 *N. J.* 417, 427 (1950); *Mellon v. Pennsylvania-Reading Seashore Lines,* 7 *N. J.* 415, 422 (1951).

Finally, the defendant contends that the verdict of $90,-000 was excessive and contrary to the weight of the evidence and therefore the defendant is entitled to have the judgment entered thereon vacated and a new trial ordered on all the issues.

*Rule* 1:2–20(*a*), as amended following our decision in *Hager v. Weber,* 7 *N. J.* 201 (1951), provides, *inter alia,* as follows:

"A verdict of a jury shall be set aside as against the weight of the evidence if, having given due regard to the opportunity of the trial court and the jury to pass upon the credibility of the witnesses, it clearly and convincingly appears that the verdict was the result of mistake, partiality, prejudice or passion."

In 1946, when plaintiff first discovered her condition she was earning about $1,200 a year. She ceased working for the city in March, 1949, but continued to receive the full amount of her salary, including increases, to the date of trial in June, 1951, at which time the plaintiff claimed she was receiving $2,100 per annum, which included a recent $400 raise; the defendant claimed she was receiving $2,500 per annum by reason of that raise. In addition, the city has provided all surgical and medical care without cost to the plaintiff with the exception of the last operation which was performed in another hospital. No evidence was offered as to her present or future earning capacity, other than the salary being paid to her by the city. There is no competent proof that the plaintiff is or will be deprived of the full use of her hands although, of course, there is some evidence of

scars due to the operations. No satisfactory prognosis was offered by the plaintiff's medical witnesses. Dr. Walker (who performed the last operation), after examining plaintiff's hands at the trial, found no progression of the malignancy in the right hand and no changes in the left hand except for a "little warty-like lesion" on the middle finger that would bear watching. He further testified that if there should be a recurrence it would probably result in the amputation of the affected hand but he carefully refrained from saying that such recurrence was likely to happen.

Based upon such evidence the verdict of $90,000 is unquestionably excessive. Indeed the amount thereof, in view of the proofs, clearly and convincingly indicates that it is the result of passion or prejudice aroused by the mysterious and dreaded connotation that the term cancer implies to the average layman, which undoubtedly led to sheer speculation by the jury. When, as here, a new trial is necessary, it may in the sound discretion of the court, be limited to the question with respect to which the verdict is found to be wrong. If separable and if the error relates solely to the *quantum* of damages, it may be set aside as to damages only if the best interests of justice will be served by a partial new trial. *Rempfer v. Deerfield Packing Corp.*, 4 *N. J.* 135, 149 (1950); *Paolercio v. Wright*, 2 *N. J.* 412, 417 (1949); *Esposito v. Lazar*, 2 *N. J.* 257, 259 (1949). *Rule* 3:59–1. "But this is a power which ought to be exercised with caution, with due regard to the rights of both parties, and only in those cases where it is certain that the error which resulted in excessive or inadequate damages did not affect the other issues." *Robinson v. Payne*, 99 *N. J. L.* 135, 142 (*E. & A.* 1923); *Juliano v. Abeles*, 114 *N. J. L.* 510, 512 (*E. & A.* 1935). Applying these principles to the record before us, we conclude that in the exercise of a sound discretion the best interests of justice require that the verdict be set aside in its entirety to the end that a new trial be had as to all issues.

Accordingly, the judgment below is completely reversed and the cause remanded for a trial *de novo*.

*For reversal in toto*—Justices CASE, OLIPHANT, BURLING and ACKERSON—4.

*For reversal as to damages only*—Chief Justice VANDERBILT, and Justices HEHER and WACHENFELD—3.