41 N.J. Super. 27 (1956)
124 A.2d 37
PHILIP W. CLOYES, ADMINISTRATOR AD PROSEQUENDUM OF THE ESTATE OF PHILIP COLIN CLOYES, DECEASED, PLAINTIFF-APPELLANT,
v.
THE TOWNSHIP OF DELAWARE, A MUNICIPAL CORPORATION OF THE COUNTY OF CAMDEN AND STATE OF NEW JERSEY, CHRISTIAN M. WEBER, THOMAS WALTON AND SAMUEL McGILL, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued June 18, 1956.
Decided July 2, 1956.
*30 Before Judges GOLDMANN, FREUND and CONFORD.
Mr. Thomas M. Farr argued the cause for the plaintiff-appellant (Messrs. Norcross and Farr, attorneys).
Mr. Warren C. Douglas argued the cause for the defendants-respondents (Mr. Warren C. Douglas, attorney for the defendant-respondent Samuel McGill; Mr. John E. Yeomans, attorney for the defendants-respondents The Township of Delaware, Christian M. Weber and Thomas Walton).
The opinion of the court was delivered by FREUND, J.A.D.
The plaintiff, Philip W. Cloyes, is the father of the decedent, Philip Colin Cloyes, and sues under *31 the Death Act, N.J.S. 2A:31-1 et seq., as administrator ad prosequendum of his estate. The Cloyes family moved to the defendant Township of Delaware in 1953. Their home abutted the land where the township had constructed and maintained its Colwick sewage disposal plant, which included an open sedimentation tank. A small ravine and creek separated the rear of the Cloyes' plot from the plant area.
On June 23, 1954 at about 6 P.M the decedent, a boy about three years of age, was observed by his mother playing with two other children in the back yard of the adjoining house. Within eight minutes of the last time she observed him the boy had disappeared. Apparently he crossed over onto the township land, entered the immediate area of the sewage plant and fell into the open sedimentation tank. When found in the tank a short time after his absence was discovered, he was dead from drowning. There was no eye witness of how the boy gained access to the plant grounds which admittedly were enclosed by a fence erected in 1952 in accordance with accepted standards. However, there was an opening of between 16 and 18 inches under a gate in the fence, and it is reasonably inferable that the boy crawled through the opening under the gate.
There is testimony by the decedent's father, supported by that of neighbors, that the children of the area frequently played in and around the plant grounds. The father testified that about a month before his son's death he had complained to the defendant Thomas Walton, the Township Director of Public Affairs, that the odors emanating from the sewage plant were obnoxious, and that for children to play in such close proximity to the open sedimentation tank was dangerous, particularly since small children could crawl through the opening under the fence. He also testified that to safeguard his son he had constructed a fence around his own property, which fence was about 150 feet distant from the plant fence. However, he admitted that the gate was not kept locked.
Since 1949 the disposal plant in question had not been supported by general taxation of all the members of the community, but had been operated as a self-liquidating *32 utility, financially supported by rental fees paid solely by homeowners who received sewerage disposal service. The plant in question was operated in conjunction with two others, and over the years had shown both profit and loss. Its income was used to pay operating expenses, as well as principal and interest charges on its outstanding indebtedness. Excess revenues, if any, were kept in a separate utility account and not commingled with general municipal funds.
At the conclusion of the evidence the trial court charged the jury that, as a matter of law, the defendants' operation of the sewage disposal plant was a governmental function and, hence, to be held accountable for the death of the plaintiff's decedent it must have been guilty of "active wrongdoing" which proximately caused the infant's death. It also charged in effect that the jury might properly take into consideration the failure of the decedent's father to take adequate precautions to protect the decedent from harm as an intervening responsible cause which would absolve the defendant from liability on the theory that there was no proximate causal connection between the defendant's negligent act and the death of the child.
The jury returned a verdict of no cause of action. The plaintiff appeals, alleging as error the above-stated portions of the trial court's charge.
It is now unquestioned that a municipal corporation in the performance of a governmental function carries out a public duty and, in the absence of statutory authority directing otherwise, is immune from responsibility for negligence in the performance of such public duty except upon proof of active wrongdoing or positive misfeasance chargeable to it. Kress v. City of Newark, 8 N.J. 562, 573 (1952). See Board of Chosen Freeholders of Sussex County v. Strader, 18 N.J.L. 108 (Sup. Ct. 1840) and Hart v. Board of Chosen Freeholders of Union County, 57 N.J.L. 90 (Sup. Ct. 1894). As to what constitutes active wrongdoing, see Allas v. Borough of Rumson, 115 N.J.L. 593 (E. & A. 1935) or positive misfeasance, see Milstrey v. Hackensack, 6 N.J. 400, 408 (1951).
*33 It is also firmly settled that where a municipality is engaged in a proprietary function, as distinguished from a governmental one, it is answerable for its negligent acts or those of its agents, as would an individual or a private corporation. Tomlin v. Hildreth, 65 N.J.L. 438 (Sup. Ct. 1900); Valentine v. Englewood, 76 N.J.L. 509, 512 (E. & A. 1908); Olesiewicz v. City of Camden, 100 N.J.L. 336, 340 (E. & A. 1924); Martin v. City of Asbury Park, 111 N.J.L. 364 (E. & A. 1933). See generally Kelley v. Curtiss, 29 N.J. Super. 291 (App. Div. 1954), reversed on other grounds, 16 N.J. 265 (1954). For a collection of similar cases in other jurisdictions see 18 McQuillin, Municipal Corporations (3d ed.), § 53.01, p. 132 et seq.; Borchard, "Government Liability in Tort, Municipal Corporations," 34 Yale L.J. 129.
The factors which have been considered in determining whether a particular function is proprietary have been: whether the function could be performed as well by a private corporation, Karpenski v. Incorporated Borough of South River, 83 N.J.L. 149 (Sup. Ct. 1912), reversed on other grounds 85 N.J.L. 208 (E. & A. 1913); whether the municipality derives a profit or merely some benefit or advantage from operation of the enterprise, Olesiewicz v. City of Camden, supra; whether the function concerns the sale of a commodity or service, establishing the relationship of seller and purchaser as between the municipality and the consumer, Lehigh Valley R. Co. v. Jersey City, 103 N.J.L. 574 (Sup. Ct. 1927), affirmed 104 N.J.L. 437 (E. & A. 1928); Martin v. City of Asbury Park, supra. In the absence of these factors, the function is considered governmental, Callan v. City of Passaic, 104 N.J.L. 643 (E. & A. 1928); Vickers v. City of Camden, 122 N.J.L. 14 (E. & A. 1938); Bengivenga v. City of Plainfield, 128 N.J.L. 418 (E. & A. 1942); Kress v. City of Newark, supra.
Thus, it has been held to be a proprietary function where the municipality operated a bathing pavilion, Martin v. City of Asbury Park, supra; supplied water to its inhabitants, Lehigh Valley R. Co. v. Jersey City, supra; Harper v. City *34 of East Orange, 105 N.J.L. 193 (E. & A. 1928); Fay v. City of Trenton, 126 N.J.L. 52 (E. & A. 1940); where it operated an asphalt plant and performed asphalt work for private persons and corporations, Olesiewicz v. City of Camden, supra; where it engaged in the furnishing of electricity to its inhabitants, Karpenski v. Incorporated Borough of South River, supra.
Ordinarily, governmental functions of a municipality are available to all taxpayers, and whether or not the specific function is utilized is not a determinant. Schools are conceded to be a municipal function devolving from a public duty, supported by all taxpayers of the municipality, whether or not they have children to avail themselves of the educational facilities provided. That is the idea of public duty, duty to all, whether or not utilized, and the situation is similar as to police and fire protection, whether or not an individual property owner ever calls the police or the fire department. However, here only those who actually use the service pay for it; it is not general and available to the municipal public at large  a consideration to be weighed in determining whether the function is proprietary rather than governmental, particularly when coupled with the fact that a service of this nature could just as well be performed by a private corporation and that it results in a seller-consumer relationship between the municipality and those using the service.
McQuillin indicates that other jurisdictions are in conflict as to whether the operation of a sewage disposal plant is a governmental or proprietary function. He states that "the prevailing view seems to be that a municipality may be held liable for death or injury resulting from neglect or other tort in the operation of such a plant." 18 McQuillin, Municipal Corporations (3d ed.), § 53.131, p. 512. This precise question has been adjudicated in New Jersey in Morgenweck v. Egg Harbor City, 106 N.J.L. 141 (E. & A. 1929). There, the defendant municipality was alleged to be liable to the plaintiffs for injuries resulting from one of the defendant's trucks used in the operation of its sewage *35 disposal plant. Mr. Justice Kalisch speaking for the Court of Errors and Appeals held:
"* * * it is quite clear that the defendant * * * was engaged in conducting the business of operating a sewerage plant for profit, and it is unimportant whether or not the business yielded a profit to the defendant * * * the potent factor which must control is the uncontroverted fact that the municipality was engaged in business, and hence answerable for the negligent act or acts of its servants in the conduct of such business, as an individual would be."
We deem it significant that in the Morgenweck case, although the sewage plant might have been intended to be operated for profit, that factor was held not to be determinative of whether the function was proprietary or governmental, relying in great measure upon the decision in the Olesiewicz v. City of Camden case, supra, that "some special benefit or advantage" inuring to the municipality is an essential ingredient in the decision.
In Ennever v. Borough of Bergenfield, 105 N.J.L. 419 (E. & A. 1928), there is dictum to the effect that the operation of a sewage disposal plant is a governmental function, but that case is not controlling here. Its essential facts differ from both the Morgenweck case and the instant one. There the case turned on the question of the amount of depreciation in value of adjacent lands resulting from the construction of the plant. There was no proof that any charge for service was made or that any special benefit accrued to the municipality, nor of any of the other factors usually considered essential to a proprietary function.
It is true that many municipalities furnish sewage disposal service. Where it is available to all and its cost of operation paid out of general taxes, it may well be a governmental or public function. However, here the service of the sewage disposal units is available only to those who pay the rental fee. The municipality operates its sewage disposal facilities as a self-liquidating utility, the income of which is used to pay current operating expenses and charges on its outstanding indebtedness. It is inconceivable that any private corporation would take on the operation of such a *36 service without a profit motive, so that the members of the community who use the service would probably pay a higher charge. Moreover, aside from this current benefit to the users of the service, the plant will, since it is a self-liquidating utility, eventually become the property of the municipality, wholly owned, free and clear of such indebtedness as was necessary for its construction, a valuable capital asset cleared of debt at no cost to the municipality as a whole. Certainly, it cannot be argued that in such circumstances the municipality is not the recipient of "some special benefit or advantage." Olesiewicz v. City of Camden, supra.
The distinction between governmental and proprietary functions has persisted and been preserved in our highest courts, as exemplified by Tomlin v. Hildreth, 65 N.J.L. 438 (Sup. Ct. 1900), and the Allas, Milstrey, Kress and Kelley cases cited above; and see Weintraub and Conford, "Tort Liability of Municipalities in New Jersey," 3 Mercer Beasley L. Rev. 142 (1934). We are bound by this higher judicial authority, Osback v. Lyndhurst Township, 7 N.J. 371, 376 (1951).
We cannot, however, pass by the matter without voicing our own doubt as to the necessity or advisability of pursuing such a distinction under the social and economic conditions that obtain today. The validity of the distinction has been questioned by legal authority. See Prosser, Law of Torts (2d ed.), § 109 et seq., p. 770 et seq., and particularly at p. 775, n. 42. The modern trend is to broaden the base of tort liability of municipal government for negligence instead of narrowly cribbing and confining it within the bounds of artificial distinctions, and this on the theory that injury to the person or property of the individual citizen because of the tortious conduct of municipal agents or employees should be compensated for by the municipality, and not borne by the injured party, municipal government being better able to bear the loss and to spread its cost through taxation. However, since the distinction between governmental and proprietary functions is embedded in our law, we must perforce proceed to our decision on that basis.
*37 Here, we are satisfied from a consideration of the circumstances under which the disposal plant is operated that its function is proprietary rather than governmental. This conclusion is based on a number of reasons: that a private corporation might supply the service equally as well, that the municipality derives a special benefit from the operation, that it concerns the sale of a service, that it is not supported by taxation and operates only for the limited segment of the community which subscribes to it on a rental basis. Accordingly, we hold to be error the trial court's charge that as a matter of law the operation of a sewage disposal plant by the defendants herein was a governmental function. Had the court charged the proper rule, the jury might properly have found as negligence defendants' failure to close the 18-inch opening under the gate, especially in view of the fact that it had notice that children played in and around the plant area. Thus, the charge was prejudicial to the plaintiff's cause and warrants reversal.
The charge is subject to further objection to that portion whereby the jury was permitted to take into consideration on the question of the defendants' liability the alleged failure of the plaintiff, the decedent's father, to take adequate precautions to guard against a mishap to his child. It is settled that contributory negligence on the part of the surviving next-of-kin of a decedent is not imputable to the decedent and will not defeat an action under the Death Act. Bastedo v. Frailey, 109 N.J.L. 390 (E. & A. 1932). The effect of the trial court's instruction was to impute to the father as representative of the decedent's next-of-kin any contributory negligence which might be attributable to him as an individual. This was error.
For the reasons herein stated the judgment is reversed and the cause remanded for a new trial on all issues.
CONFORD, J.A.D. (concurring).
I am in agreement with the conclusion of the majority that the judgment entered in favor of the defendants should be reversed and the cause remanded for a new trial. My concurrence rests, *38 however, only upon the prejudicial error in that part of the charge of the court to the jury which, in effect, permitted the jury to find for the defendants on the basis that the failure of the parents of the decedent child to exercise care for his safety would negate the requisite proximate cause. Insofar as the majority rests its decision upon the additional ground that the trial court erred in charging the jury that the defendant township was engaged in a public or governmental function in its operation of the sewage disposal plant, I am unable to agree. In my opinion, the charge in that respect was correct.
I share the doubts expressed by my brethren concerning the wisdom of existing concepts of municipal tort liability. There is considerable basis for misgiving as to the suitability in present-day society of the traditional distinction between public or governmental functions of municipalities, on the one hand, and so-called proprietary, private or corporate functions, on the other, as a criterion for differentiating the degree of municipal liability. The impact of carelessness, negligence or misfeasance by municipal agents and employees upon others continuously expands as local governments become charged with a constantly broadening area of governmental responsibility. Authoritative students of the subject are coming increasingly to believe that the losses to individuals due to tortious conduct of any kind by municipal functionaries should fall upon the municipality, rather than remain with the injured individual, as a legitimate cost of the administration of government. See Prosser, Law of Torts (2d ed. 1955), § 109, pp. 774, 775, and the numerous treatments of the subject cited in footnote 42, at p. 775. See also 18 McQuillin, Municipal Corporations (3d ed. 1950), § 53.24, p. 205. There would appear to be no rational social justification for a differentiation in degree of liability, for example, stemming from the circumstance that the municipality was supplying water or electricity, held to be proprietary functions, Fay v. City of Trenton, 126 N.J.L. 52 (E. & A. 1941); Karpenski v. Incorporated Borough of South River, 83 N.J.L. 149 (Sup. Ct. 1912), rather than police and fire *39 protection, or hospital or road service, viewed from the vantage point of those damaged in person or property by the particular act of municipal default, or in relationship to the general juridical theory that those suffering from the wrongful activities of others should be compensated therefor. I also agree, however, that this court is confronted with and must abide by distinctions imbedded in our case law between governmental functions and proprietary functions having their origin in the concept that negligence in the performance of a duty owed to the general public, rather than to an individual, will not give rise to an action by the injured individual against the public representatives, Board of Chosen Freeholders of Sussex County v. Strader, 18 N.J.L. 108 (Sup. Ct. 1840), and maturing in the presently held canon that liability attaches for negligence only in connection with private or proprietary functions, while liability in respect to public or governmental operations is limited to "active wrongdoing" or "positive misfeasance," Milstrey v. City of Hackensack, 6 N.J. 400, 408 (1951).
As stated in one of the earliest New Jersey cases to make the distinction, Tomlin v. Hildreth, 65 N.J.L. 438, 441, 442 (Sup. Ct. 1900):
"It will thus appear that the liability of a municipal, corporation for the willful or negligent act of its agents or servants will depend upon the question of whether they are its agents or servants for the performance of a public duty imposed by law, or merely for the carrying out of its private duties, which are for its special benefit or advantage. If the relation is of the former class the municipality is not liable, but if of the latter class it is."
Iteration of variants of this formula will be found in our subsequent cases down to the present time. Allas v. Borough of Rumson, 115 N.J.L. 593, 594 (E. & A. 1935); Kress v. City of Newark, 8 N.J. 562, 572 (1952). The difficulty of applying these tests of liability is exemplified by the close divisions of the Supreme Court in the Milstrey and Kress cases, supra, and is attested by the perplexities of generations of lawyers and judges in attempting to apply them with some degree of consistency in theory and result. *40 See the illuminating discussion of some phases of the problem in Kelley v. Curtiss, 29 N.J. Super. 291, 296-298 (App. Div. 1954), reversed on other grounds, 16 N.J. 264 (1954); "Tort Liability of Municipalities in New Jersey," 3 Mercer Beasley Law Review, 124 (1934), passim. There are consequently presented not only difficult problems of judicial administration but also continued shortcomings in the salutary objective of making whole those who sustain injury from public agencies through no fault of their own. See Moran, "General Administrative Law," 10 Rutgers L. Rev. 37, 69-73 (1955).
Yet so long as these rules continue to be applied by our court of highest jurisdiction and are left undisturbed by the Legislature, it is our duty to follow them. In determining whether a particular activity is to be classified as governmental or private, however, no consideration based upon the reaction of the court to the wisdom of the degree of liability implicated by the determination ought to influence the judicial conclusion. Cf. Prosser, op. cit. supra, at p. 775. The criteria heretofore approved by our courts of highest appellate jurisdiction should be applied in the light of the rationale of the rule. McQuillin formulates it, in terms of its application to quasi-public corporations, as follows:
"The immunity from liability of quasi-public corporations is generally placed upon the ground of their involuntary and public character. They are usually treated as public or state agencies, and their duties are ordinarily wholly governmental. They exercise the greater part of their functions as agencies of the state merely, and are created for purposes of public policy, and hence the general rule that they are not responsible for the neglect of duties enjoined on them, unless the action is given by statute. * * *" Op. cit., supra, § 53.05, p. 151.
Other explanations are that the municipality derives no profit from the exercise of governmental functions which are solely for the public benefit; that cities cannot carry on their governments if money raised by taxation for public use is diverted to making good the torts of employees and *41 that it is unreasonable to hold the corporation liable for negligence in the performance of duties imposed upon it by the legislature rather than voluntarily assumed under its general powers. Prosser, op. cit., supra, § 109, p. 774. An early New Jersey case puts it thus:
"* * * that the corporation is engaged in the performance of a public service in which it has no particular interest and from which it derives no special benefit or advantage in its corporate capacity, but which it is bound to see performed in pursuance of a duty imposed by law for the general welfare of the inhabitants and the community, * * *" Condict v. Mayor, etc., of Jersey City, 46 N.J.L. 157, 160 (E. & A. 1884).
This philosophy persists in the references in our cases to immunity for negligence in the performance "of a public duty laid upon it [the corporate municipal body] by law," Milstrey v. City of Hackensack, supra (6 N.J., at page 408), otherwise stated, "for the negligence of its officers or agents in the performance of a public duty imposed on it by law," Allas v. Borough of Rumson, supra (115 N.J.L., at page 594). It is obvious, however, that this language cannot be taken literally, since not all municipal functions which commonly give rise to tortious injuries are founded in statutory mandates to municipalities, many being undertaken pursuant to permissive legislation. For example, in Kress v. City of Newark, supra, the question involved was negligence in the operation of a municipal hospital. The hospital of the defendant city was established and maintained by it pursuant to a permissive statute, yet "the maintenance of a hospital by a municipality for the purpose of conserving public health, treating indigent patients and applying money receipts to expenses" was held to be the exercise of a governmental rather than a proprietary function (8 N.J., at pages 572, 573). It is thus clear that the case at hand cannot be decided by the test as to whether the municipality was required, rather than merely permitted, to supply the sewage service.
In the cause sub judice the status of a proprietary rather than governmental function is applied by the majority to *42 the operation of the defendant's sewage disposal plant. Physically, this is an operation by which household and industrial wastes are collected and transmitted through pipes to a central receiving station where the raw sewage is treated chemically and by aerobic action in such a way as to produce a purified effluent which flows off into a running stream. Modern science and the force of advances in public health standards and techniques, implemented by legislation giving substantial police power in this area to the State Board of Health, has led to considerable growth in the use of this kind of sewage disposal, in place of the practice of dumping untreated sewage in tidal waters. See Borough of Westville v. Whitney Home Builders, Inc., 40 N.J. Super. 62 (App. Div. 1956). The testimony adduced at the trial indicates that the defendant municipality has been using sewage disposal plants since 1926. Until 1949 the operation of these plants was financed by general taxation although they never served the entire township. Beginning that year the State Board of Health required the township to expand and modernize its facilities. The first part of the program was the enlargement of the Erlton plant; later the plant serving the Colwick District, that involved in the fatal accident which gave rise to the present action, was substantially enlarged and improved. Because of protests from those residents of the township whose properties were so situated as not to be susceptible of connection with the township sewer system, it was decided that thereafter the costs of operation and expansion should be met by rents charged against the users of the service. The testimony indicates that the financing of the plants was arranged on the basis of a "self-liquidating utility," pursuant to statutory authorization. R.S. 40:1-78, 79. When these plans were being executed, from 1949 to 1954, there was in existence a 1946 legislative enactment intended to facilitate the very kind of plan, and financed in substantially the same way, as was decided upon by the defendant. This was L. 1946, c. 138 (N.J.S.A. 40:14A-1, et seq.), superseding the former statute governing "self-liquidating sewers and disposal plants," R.S. 40:63-140 *43 et seq. (L. 1933, c. 364). The principal purpose of the 1933 statute was recited therein to be "to authorize municipalities, either separately or in combination with other municipalities, by means of a commission, to own, construct, maintain, operate and improve works for the collection, treatment, purification and disposal of sewage" (L. 1933, c. 364, § 101). The 1946 enactment evidences modern legislative concepts concerning the public nature and importance of sewage disposal plants, operated and financed in practically identical fashion with that of the present defendant. It is declared, in section 2 thereof:
"It is hereby declared to be in the public interest and to be the policy of the State to foster and promote by all reasonable means the relief of waters in and bordering the State from pollution and thus to reduce and ultimately abate the menace to the public health resulting from such pollution. It is the purpose and object of this act to further and implement such policy by
(1) Authorizing counties, or municipalities either separately or in combination with other municipalities, by means and through the agency of a sewerage authority, to acquire, construct, maintain, operate or improve works for the collection, treatment, purification or disposal of sewage or other wastes; * * *"
Section 7 of the 1946 act provides that "every sewerage authority shall be a public body politic and corporate constituting a political subdivision of the State established as an instrumentality exercising public and essential governmental functions to provide for the public health and welfare * * *." (Emphasis added.) It is patent that the defendant municipality is doing, and in the same way, exactly what such a sewerage authority could be authorized to do for it under that act.
The characterization by the statute of this kind of function as "public and essential governmental" appears to me aptly descriptive of defendant's operations, as described in the record. The proofs in the present case indicate that when the Colwick plant was enlarged and improved in 1953 and 1954 the schedule of rentals to users of the service was fixed upon a basis which would yield no more revenue than sufficient to pay the cost of current operation and the charges for *44 retirement and interest upon the capital improvement bonds. Any casual annual profit is applied to reduction of the debt. The charges do not include depreciation and obsolescence of the equipment. Presumably any deficits in the operation and financing of the project will be met by the municipality at large.
The construction, operation and maintenance of sewer systems, generally, without distinguishing sanitary sewers from storm sewers, has traditionally and uniformly been regarded in this State as a public governmental function whenever the question of tort liability of a municipality has arisen. Jersey City v. Kiernan, 50 N.J.L. 246 (Sup. Ct. 1888); Waters v. City of Newark, 56 N.J.L. 361 (Sup. Ct. 1894), affirmed 57 N.J.L. 456 (E. & A. 1894); Harrington v. Woodbridge, 70 N.J.L. 28 (Sup. Ct. 1903); Murphy v. Borough of Atlantic Highlands, 77 N.J.L. 452 (Sup. Ct. 1909); Garrison v. Borough of Fort Lee, 92 N.J.L. 566 (E. & A. 1919); Ennever v. Borough of Bergenfield, 105 N.J.L. 419 (E. & A. 1929); Bengivenga v. Plainfield, 128 N.J.L. 418, 420 (E. & A. 1942). It can hardly be disputed that the collection and disposal of sewage at large in a sanitary manner is a function vital to the general public health, well-being and welfare, peculiarly adapted to administration by a local public agency, and seldom, if ever, conducted as a business by private firms. It should follow by ordinary criteria that the performance thereof by a public body constitutes the execution of a function inherently public or governmental in character. In the Ennever case, supra, the Court of Errors and Appeals specifically stated that the defendant municipality was "performing a public duty in constructing and operating" a sewer and disposal plant but sustained a holding of liability on the basis of the commission of an active wrong (105 N.J.L., at page 420). In other jurisdictions there is a tendency to find municipalities liable for torts in the operation of sewage disposal plants, but the majority of the cases recognize the public nature of the service. 18 McQuillin, op. cit., supra, § 53.131, pp. 512, 513.
*45 I am not persuaded that the discharge of that kind of responsibility by the defendant township in the present case falls from the area of public or governmental administration into that of a proprietary or business operation by mere reason of the fact that the system is supported by direct charge to the users of the service rather than through general taxation. Such a plan is contemplated by the 1946 statute yet described therein as serving a "public and essential governmental function." It has never been thought, moreover, that the construction of roads, curbs, sewers and similar public appurtenances was any the less a public enterprise because partly financed by special assessments against benefited property rather than in entirety by general taxation. See R.S. 40:56-52 et seq. In the present case, as indicated, physical circumstances prevented the municipal sewer system from being made available to some sections of the township, and it was therefore deemed more equitable that financing thereof be effectuated by direct charge to users of the service than by taxation at large. In my opinion, this in no way derogates from the essential public nature and character of the function performed, nor does the circumstance that, for the reasons indicated, the service is rendered to a lesser area than the entire municipality.
The majority finds the decision in Morganweck v. Egg Harbor City, 106 N.J.L. 141 (E. & A. 1949), to control the present case. In that case the plaintiffs brought an action for injuries resulting from the negligent operation of a municipal truck used in connection with a municipal sewage disposal plant. The opinion of the court stated that the action was founded upon the allegation in the complaint that the defendant municipality "was carrying on a business of operating a sewer system as and for a means of revenue" (106 N.J.L., at page 142) and indicated that the testimony showed that the defendant "was engaged in conducting the business of operating a sewerage plant for profit." The court held that it was "unimportant" whether or not the business yielded a profit to the defendant; that the controlling factor was "that the municipality was engaged in *46 business, and hence answerable for the negligent acts of its servants in the conduct of such business, as an individual would be" (106 N.J.L., at page 143). The court cited and relied upon Olesiewicz v. City of Camden, 100 N.J.L. 336 (E. & A. 1924), which dealt with the operation of a municipal asphalt plant which, at the time of the operation giving rise to the allegedly tortious injury, was performing work on contract with a private concern. It is clear to me that the factual situation apparently presented in the Morganweck case is not that which confronts us here. There is no basis in the past or present conduct of its sewer system by the defendant municipality fairly to support a finding that it was conducting that function "as a means of revenue" or "for profit," either in the sense of motivation for the inception or continuance of the operation or in respect to the actual fiscal result thereof. It was not conducting a "business," in any true sense. The majority make the point that when the bonds are paid off the municipality will own the plant as an unencumbered asset, thus constituting a "special benefit." This I believe misplaces the emphasis on a mere incident of the operation, rather than upon the essence and purpose of the service performed, which should control. Any distinction sought to be drawn between the sewer system of the municipality involved in the present case and the typical municipal sewerage operation which is financed by general taxation and dumps its sewage into tidal waters, rather than treating it in a disposal plant, seems to me wholly illusory. If one is a public and governmental function, so is the other. I cannot perceive in what sense the present operation is soundly to be regarded as attended by "some special benefit or advantage" to the municipality in its corporate capacity from operation of the enterprise, as distinguished from a duty performed pursuant to law "for the general welfare of the inhabitants and the community," so as rationally to subserve the concept that the enterprise was private rather than public. Cf. Olesiewicz v. City of Camden, supra (100 N.J.L., at p. 340); Condict v. Mayor, etc., of Jersey City, supra (46 N.J.L., at page 160).
*47 Plaintiff stresses the analogy of the cases holding water and electric supply to be proprietary functions. But this is not a field in which logic has played a consistently significant part in the development of doctrinal classifications. There remains the solid line of cases holding sewerage to be a public function. The question here is whether the present situation can be distinguished from them. Perhaps the water and electricity cases were influenced by the common existence of private public utilities in those fields. Whatever the reason for those holdings, the subject here is sewerage, not water or electricity, and I cannot find a persuasive basis to distinguish this case from the adjudicated sewerage decisions cited above.
While I concede that acceptance of my view would place the municipal operation in question in a category of more restricted tort liability than that attendant upon the conclusion of the majority, I do not believe the long-range development of the law in this field along salutary lines will be served by a strained interpretation of the concept of proprietary and business enterprises of municipal corporations. Cf. Prosser, op. cit., supra, at p. 775. On the contrary, it would seem to me but a crutch to sustain a weak doctrine and to delay the day of complete reappraisal.