94 N.J. Super. 505 (1967)
229 A.2d 267
RALPH JACKSON JR., AN INFANT BY HIS GUARDIAN AD LITEM, RALPH JACKSON AND RALPH JACKSON, INDIVIDUALLY, PLAINTIFFS-APPELLANTS,
v.
THOMAS HANKINSON AND THE BOARD OF EDUCATION OF THE BOROUGH OF NEW SHREWSBURY, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued November 21, 1966.
Decided April 24, 1967.
*508 Before Judges CONFORD, FOLEY and LEONARD.
Mr. Thomas F. Shebell, Jr. argued the cause for appellants (Mr. Thomas F. Shebell, attorney).
Mr. Joseph P. Rose argued the cause for respondents (Messrs. Oppenheim & Oppenheim, attorneys; Mr. Albert E. Fershing, on the brief).
The opinion of the court was delivered by CONFORD, S.J.A.D.
This is an action in negligence to recover damages for loss of the sight of an eye sustained by infant plaintiff when he was struck by a pellet of some kind propelled at him with a rubber band by a fellow pupil on a school bus engaged in transporting him home from school. Defendant Hankinson was a contract operator of his own bus for defendant school board ("board" hereinafter). At the close of the evidence the board was on motion relieved of liability by the trial court on the ground that its activity in connection with the transportation of school children by bus was governmental in nature; that liability in such case could *509 be premised only on a showing of "active wrongdoing," and that the evidence would not reasonably permit a jury finding to that effect. Defendant Hankinson won a verdict of no cause of action from the jury.
Plaintiffs' appeal raises claims of error in the dismissal ordered with respect to the board and in the standard of care set forth in the court's charge in relation to Hankinson's duty to the children on the bus.
On June 7, 1963, the date of the occurrence in question, infant plaintiff ("plaintiff" hereinafter) was 13 years of age and one of a busload of children of comparable age being transported home from the Tinton Falls elementary school by Hankinson. The latter had been a contract busman for the board for some 20 years. There was testimony that on the day in question and on the two previous days a number of boys on the bus had been engaged in "shooting" paper clips, "spitballs" and miscellaneous other pellets at each other and at other pupils with rubber bands. Plaintiff testified that during the course of the journey on June 7 he was bent over in his seat to avoid being struck by the "stuff being thrown around," sat up when he thought it was safe, and was struck in the eye when he turned in his seat to view the rear of the bus. The object felt like "something metal." Plaintiff's testimony was in general corroborated, but there was some testimony, although controverted by him and others, that he had done some of the "shooting" before being struck. The boy who inflicted the injury was not a defendant nor present at the trial. There was medical testimony that plaintiff's injury was due to the eye's being struck by a "foreign object."
There was testimony that Hankinson was expected by the board to maintain order on the bus. He was assigned by the school authorities as assistants for this purpose other pupils, a girl and a boy, about the same age as plaintiff, to act as "safety patrolmen." On the day of the accident the boy patrolman was absent from school and thus not on the bus on either trip. Hankinson testified that he customarily tried to keep order by verbal directions to unruly pupils, by having *510 them seated near him and, in serious cases, by reporting the miscreants to the principal. But state school regulations prohibited him from discharging any pupil from the vehicle until his destination. The bus was equipped with a large interior rearview mirror to enable the driver to see the occupants while driving, and the passenger seats were low-backed, permitting view of all seated passengers. Some testimony indicated that Hankinson's method of correcting unruly children, particularly on the day of the accident, was merely by upbraiding them through the mirror.
Hankinson testified that on the day of the accident he observed many of the pupils enter the bus with rubber bands but thought they had been issued to the pupils for school purposes. However, after the second stop that day he took some bands away from pupils who were using them to "sting" girls leaving the bus. He said he was never aware of paper clips being shot by boys nor, on the day in question, of any objects being propelled at all. There was other testimony that both on that day and the day before he had taken rubber bands away from boys and that the girl safety patrolman had taken bands away from boys who were shooting paper clips prior to the accident. That girl testified that because of the absence of the other pupil-patrolman she had to stand in front and watch the whole bus, front and back. When she reported to Hankinson what was going on, he stopped the bus and threatened to put everyone off. But the unruly activity continued. She also testified that the children obtained the rubber bands and paper clips from teachers' desks in the schoolrooms.
One girl testified that the boy who injured plaintiff had been roaming the bus and shooting pellets from different points, then ducking to avoid reprisal.
A teacher who was in charge of the school's safety program testified he instructed the safety patrolmen on keeping order but did not speak to Hankinson on the subject. According to one of the patrolmen, they were to report any disorder to Hankinson, who was, in turn, to report it to *511 the principal. Hankinson was not instructed as to procedures to be taken on occasions when a safety patrolman would be absent or would have left the bus before the end of the route. The safety teacher said the only purpose of having two safety patrolmen on the bus was so that there would be at least one if the other were absent, but he admitted that the two were expected to "work as a team on the bus" and to exercise "equal power."
The school principal testified that he and the safety teacher "quite often" visited the buses before they left the school. When the driver reported an unruly situation, they would go out and "speak to the entire bus." Aside from suggesting that drivers seat individual children with behavior problems in the front of the bus, he did not instruct drivers concerning disciplinary action or as to safety precautions to protect children from eye injuries. Teachers were not instructed to keep rubber bands and paper clips away from children who might take them from classrooms. Classroom teachers were instructed as to dangers to children's eyes from objects which might be thrown or propelled either in the classroom or on buses, but no such instructions were imparted to bus drivers.

I
As their first ground of appeal, plaintiffs argue that the court erred in instructing the jury that Hankinson was under a duty to "exercise reasonable care," or such care as "a reasonably prudent person would use under the existing and proven circumstances," in respect of controlling the children to prevent harm to some of them. The contention is that the instruction should have assessed "a high degree of care" and stated that the defendant "owed the utmost care for the safety of the students" on the bus. The argument is premised on the duty owing by a common carrier of passengers and the assumption that the same standard of care is applicable to anyone who transports people for a *512 charge whether or not a common carrier. Hankinson concededly was not a common carrier.
We are not persuaded by the argument. No New Jersey case is cited in support of the proposition. While there is language, at times ambivalent, in some cases supportive of plaintiff's argument, see Sepulvado v. General Fire & Casualty Company, 146 So.2d 428, 431 (La. Ct. App. 1962); Maley v. Children's Bus Service, 203 Misc. 559, 117 N.Y.S.2d 888, 889, 890 (Sup. Ct. 1952), affirmed, 282 App. Div. 920, 125 N.Y.S.2d 643 (App. Div. 1953); Cartwright v. Graves, 182 Tenn. 114, 184 S.W.2d 373, 375, 378 (Sup. Ct. 1942), yet the Supreme Court of Errors of Connecticut has very recently held to the contrary. Hunt v. Clifford, 152 Conn. 540, 209 A.2d 182 (1965).
In Hunt the court traced the origin of the rule of "high degree" of care owing by a common carrier to passengers to the analogue of almost absolute liability of common carriers in respect of goods, and found no reason to extend the rule beyond common carriers to one operating a school bus pursuant to special contract with a school board. In accord: Shannon v. Central-Gaither Union School Dist., 133 Cal. App. 124, 23 P.2d 769 (D. Ct. App. 1933). The question was left open in Gazaway v. Nicholson, 190 Ga. 345, 9 S.E.2d 154 (Sup. Ct. 1940), affirming the decision of the Court of Appeals in 61 Ga. App. 3, 5 S.E.2d 391 (1939) which had stated a rule of "extraordinary care and diligence."
It seems to us that the rule of care such as a reasonable person of ordinary prudence would exercise under the circumstances is equal to the demands of justice in a school bus case, particularly if the trial court points out that the amount of care called for under that standard may be higher than ordinarily if the particular circumstances present special hazards, as was arguably the case here. See Ambrose v. Cyphers, 29 N.J. 138, 144 et seq. (1959); Hunter v. Boyd, 203 S.C. 518, 28 S.E.2d 412, 414 (Sup. Ct. 1943) (an appropriate application of the rule in a school bus case). *513 We find the charge of the trial court in the instant case to be fair and adequate in the respect under discussion.
The courts of this State have shown no disposition to extend the rule of "high degree of care" of common carriers to other carriers of passengers for a consideration. See Hollander v. Smith & Smith, 10 N.J. Super. 82 (App. Div. 1950), certification denied 6 N.J. 399 (1951); Garafola v. Rosecliff Realty Co., Inc., 24 N.J. Super. 28 (App. Div. 1952). We find no reason to do so in the case at hand.
Plaintiffs have made a separate point of the fact that the court told the jury: "The burden of saying what amount of care Hankinson was obliged to exercise will of course be yours." (Emphasis ours) However this did not, as plaintiffs imply, delegate to the jury the decision as to the standard of care which in law constituted the measure of defendant's conduct for determination of liability. The court here was but applying the rationale of Ambrose v. Cyphers, supra. It had fully instructed on the standard of care imposed on defendant. Whether defendant's conduct displayed the amount of care called for in the special circumstances was for the jury's resolution under the standard of care given it by the judge. Ambrose v. Cyphers, supra, 29 N.J., at pp. 145-146. This was all that the criticized portion of the charge was intended or fairly calculated to convey to the jury.
Since plaintiffs do not argue that the evidence was not such as to permit the jury to exculpate Hankinson on the basis of the trial court's charge concerning the legal measure of his duty, the judgment in his favor must be affirmed.

II
In their attack upon the dismissal below in favor of the board, plaintiffs first criticize the introduction of the issue of governmental immunity into the trial by the judge upon the argument of the motion for dismissal at the end of plaintiffs' case. They stress that nowhere in defendants' answer or opening to the jury, nor in the pretrial order, is that issue *514 projected as a defense. R.R. 4:8-3 requires the pleading of certain defenses "and any other matter constituting an avoidance or affirmative defense." We think the spirit of the rule called for pleading the defense of qualified immunity of a municipality so as to avoid surprise. However, it has been held that where public policy calls for it a defense will be considered properly before the court although not pleaded (subject impliedly to absence of prejudice). Douglas v. Harris, 35 N.J. 270 (1961); and see Kress v. City of Newark, 8 N.J. 562 (1952).
Clearly, the rule of qualified immunity of municipalities from tort liability, although a defense disfavored by present-day courts, is nevertheless a manifestation of public policy such as to have justified entertainment of the issue by the trial court so long as plaintiffs were not prejudiced. We fail to perceive prejudice. The ultimate issue under that defense, if applicable, is whether the facts spell out active wrongdoing rather than mere passive neglect. Plaintiffs fail to suggest what proofs would have been forthcoming which were not in fact adduced were they apprised in advance that defendants were asserting the defense. Nor did they request time to prepare for the defense because surprised, or move for a mistrial.
There is no basis for reversal on the ground under discussion.

III
Next, plaintiffs argue that the claimed immunity does not apply because the function of transportation of children to school under board of education auspices is a proprietary, not a governmental function. The trial court held to the contrary on the basis of McKnight v. Cassady, 113 N.J.L. 565 (E. & A. 1934), which held the operation of a school bus, owned by a board of education and driven by its employee, to be a governmental function of the board for purposes of tort liability. This is the general rule. Annotation 160 A.L.R. 7, 197-200, supplem. 86 A.L.R.2d 489, 586-591. Plaintiffs, *515 however, urge that we not follow it because not in accord with present-day thinking in this field. It might be suggested, further, that in McKnight the defendant bus driver and board of education were, respectively, board employee and owner of the bus, whereas here the bus was owned and operated by an independent contractor.
Ordinarily, in endeavoring to determine whether the activity in question is governmental or proprietary for tort immunity purposes, we would be relegated to the type of subordinate inquiries (antiquity of the function, whether mandated by statute, special charges made for this service, etc.) found necessary, although sterile and unsatisfactory, in such cases as Cloyes v. Delaware Township, 23 N.J. 324 (1957), and Weeks v. City of Newark, 62 N.J. Super. 166 (App. Div. 1960), affirmed o.b. 34 N.J. 250 (1961). In those decisions, while expressing dissatisfaction with the governmental-proprietary criterion for determining municipal tort immunity, but being unready to discard the doctrine, the courts found proprietary character after extended analysis and thereby served the objective of parity of liability with tortfeasors generally (those decisions involved sewerage treatment plants and swimming pools). Here, however, we are saved such analyses since we are bound by decisions of the Court of Errors and Appeals and find no justification for not following the McKnight decision in the instant case. The possible distinction based on Hankinson's independent contractor status and the board's non ownership of the bus is not fairly tenable in view of the board's assumption of control with respect to matters of safety of the children while on the buses and the regularity and continuity of the board's arrangement with Hankinson for the doing of this work. See Andryishyn v. Ballinger, 61 N.J. Super. 386 (App. Div. 1960), certification denied Andryishyn v. Bayonne Block Co., 33 N.J. 120 (1960). Indeed, the underlying assumption upon which this case was tried  that the board had a supervisory duty of some degree to the children on this bus in respect of safety  compels the conclusion that the transportation here was a board *516 activity regardless of the means by which it was effectuated. As such, the activity is in the area of public education and governmental in nature, within the scope of the McKnight case, supra. Otherwise, we would have the totally illogical result that the board would be subject to a different standard of liability for identical conduct on its part, differentiated only by whether it owned the bus and hired the driver or whether it engaged the services of a driver owning the bus.
Thus, we conclude the trial court was correct in proceeding on the premise that the board was engaged in a governmental activity and in consequently regarding the case as controlled by the rule restricting the liability of the board to active wrongdoing. Cloyes v. Delaware Tp., 23 N.J. 324, 329 (1957).

IV
However, we differ with the court's conclusion that the evidence here could not have permitted a jury finding of active wrongdoing by the board within the recent much broadened applications of that vestigial concept in municipal tort liability cases. Hayden v. Curley, 34 N.J. 420 (1961); McAndrew v. Mularchuk, 33 N.J. 172 (1960); Kelley v. Curtiss, 29 N.J. Super. 291, 297 (App. Div. 1954), reversed on other grounds, 16 N.J. 265 (1954). As stated in Hayden v. Curley, supra, 34 N.J., at pp. 425-426: "Our courts have held that an affirmative act in the causative sequence resulting in injury is sufficient to sustain municipal liability. The last event in the sequence may be non-action, but the total sequence constitutes active wrongdoing." As further indicated therein (at p. 426), the requisite actionable wrong may consist of negligent omission or omissions in the causative sequence.
Applying these criteria, we find ample basis for a reasonable jury finding of negligent omissions by the board, and also the requisite affirmative action in the causative sequence. There was affirmative action by the board in placing this group of children in a moving bus under circumstances *517 where concomitantly operative omissions by the board could produce a substantial risk of serious injury to any of the children.
Initially, we have recently been reminded that "[t]he duty of school personnel to exercise reasonable supervisory care for the safety of students entrusted to them, and their accountability for injuries resulting from failure to discharge that duty, are well-recognized in our State and elsewhere." Titus v. Lindberg, 49 N.J. 66 (1967). In this case the jury could have found that the board knew or should have known of the propensity of children of this immature age group to throw or propel objects endangering eyesight. Indeed, the principal testified that teachers were instructed to take specific measures in this regard, but bus drivers were not. In this light the jury could further have found that failure to exercise precautions to prevent such children from acquiring rubber bands and paper clips from teachers' desks before boarding a bus where they would not be subject to the direct surveillance of a teacher was fraught with hazard. Negligence could also reasonably be found in failing to see to it that a substitute safety patrolman be assigned or deputized in the event of absence of one regularly assigned, as here. It is noteworthy, in addition, that while safety instructions were given by school personnel to the safety patrolmen and to teachers, none was afforded the bus driver. Furthermore, the board's representatives had assumed specific responsibility for the safety of pupils on buses (directions to driver that he maintain order; appointment of safety patrolmen; visiting buses frequently to check on behavior), but a jury could have concluded that the assumption of responsibility in this regard was inadequately implemented by reasonably effective methods of supervision of children with potentially dangerous habits. See Titus v. Lindberg, supra; Selleck v. Board of Education, 276 App. Div. 263, 94 N.Y.S.2d 318 (App. Div. 1949), motion for leave to appeal and rehearing denied, 300 N.Y. 764, 90 N.E.2d 902 (Ct. App. 1950). Further, to the knowledge of agents of the board, a specific *518 dangerous situation had existed, so the jury could have found, for two days prior to the date of the accident without adequate corrective measures by the Board.
The issue of the board's affirmative wrongdoing should have been submitted to the jury.

V
Finally, the board argues that the result below was in any event correct because of the alleged break in the chain of legal cause constituted by the independent "intervening cause" of the intentional act of the boy who shot the pellet. The argument is without merit. Titus v. Lindberg, supra, 49 N.J., at p. 66.
Judgment reversed and cause remanded for a new trial as to the board. No costs on the affirmance as to Hankinson.